SYLVIA V. O'DELL v. LOST TRAIL, INC., a Corporation, Employer, and NEW AMSTERDAM CASUALTY COMPANY, a Corporation, Insurer, Appellants.—100 S. W. (2d) 289.

Division One, December 14, 1936.

*Green, Henry & Remmers* for appellants.

*Joseph N. Hassett* for respondent.

HYDE, C.—This is an appeal by defendants, employer and in-surer, from a judgment of the Circuit Court of Iron County affirm-ing an award of the Workmen's Compensation Commission of $7746 for the death of Emmett C. O'Dell. Both parties agree that the only issue is whether there is substantial evidence to support the finding of the commission that O'Dell's death resulted from an ac-cident arising out of and in the course of his employment. The com-mission's finding of fact also stated that O'Dell "had gone to look over land for turkeys and was shot by squatter."

The employer was a corporation, in the business of raising and selling turkeys. Employer owned land in Reynolds County which it used for this purpose. O'Dell lived there and was employed in January, 1933, at a salary of "$75.00 a month plus fifty cents for each turkey raised and sold." He was "furnished a house in which to live . . . provisions, . . . everything he could raise on the place," and an automobile truck. He "had no special hours for work," but "was supposed to be on all hours, day and night, if necessary." Employer's manager visited O'Dell in No-vember, 1933, and informed him that turkeys might be put on a track of land in Iron County. He said: "I told him before I left' I wanted him to come up in Iron County, . . . where the Egyptian Tie & Timber has 5,000 acres of cut-over land, and look that land over with the view of putting fifteen hundred birds there the following year. . . . I told him to come up here the first of the following week and contact the squatters on this land and arrange to have them take him over the place and show him where the springs and water was, . . . work out a place where we would locate these birds the following year. . . . I told him to go up

there and make friends with these squatters, because they would be very valuable to use the following year in handling these birds. . . . Spend all the time necessary going over that land thoroughly.'' The manager also said that O'Dell ''had authority to hire and pay for other help, which he thought necessary, and to charge expenses on his expense account.'' The manager said he brought whiskey to O'Dell; that in ''a great many cases . . . you could have a few drinks with very great success in forming friendships and making contacts;'' but that he ''did not instruct Mr. O'Dell to take whiskey and dispense it among those squatters.''

The manager left on Sunday, November 12th, and O'Dell was killed by Charles Casteel, a squatter on the Iron County land, on the morning of Wednesday, November 15th. According to defendant's evidence, O'Dell went to the land on Tuesday afternoon, had gone over part of it with Casteel, had located some springs, and had made some arrangement to come back the next day. O'Dell's wife said that on Tuesday he had been out ''to get information about the people living there and how to get in there.'' She said that the manager's instructions were ''to look the 5,000 acres over . . . to go and try to make friends with the squatters living there . . . to go early and get in a full day and to report . . . as soon as possible.'' She further stated that ''the night preceding the death her husband left some time after midnight;'' that ''he took a shotgun and his dog and a saddle;'' and that ''he also took a .38 Colt . . . always carried that.'' It was shown that he held a deputy game warden's commission.

Claimant relied upon the testimony of B. H. Lorentz, who accompanied O'Dell at his request to drive his car on the morning he was shot. Lorentz said that he frequently drove for O'Dell. He said they left his house about two A. M. and drove to Ironton ''where they had a sandwich and had three glasses of beer,'' and stayed there ''around an hour and a half.'' He said that they did not drink any more; however, O'Dell had a bottle of whiskey. Then they drove to Casteel's place, reaching there about five o'clock. Lorentz did not know Casteel. Viewing his testimony from the standpoint most favorable to the commission's findings, the events thereafter, as he related them, were about as follows: ''Mr. O'Dell sounded the horn, and a lady came to the door, and Mr. O'Dell said, 'We are here a little bit earlier than we intended, but' he said, 'we would like to get some fire; it is a little cool.' . . . The house had about two rooms, the living room and the bedroom together, and the kitchen in the rear. . . . After we got in the house Mr. O'Dell said, 'We are going to look over the land this morning and kill some birds as we go over the land.' Mr. Casteel said, 'Yes; that is right.' . . . Mr. O'Dell then gave Mr. Casteel a drink. He hadn't got up out

.of bed yet. Up to that time there had been nothing taken out of that bottle. One of Mr. Casteel's small boys and one of his girls, and, I believe, a larger boy, took a drink. . . . Mrs. Casteel went in the kitchen to get breakfast, as well as I remember, and Mr. Casteel got up out of bed. . . . The girl was sitting up in the bed at that time and Mr. O'Dell said, 'Gee, you have pretty hair,' he said, 'can I plait it?' and he said. 'I can plait nothing but three plaits' and taken hold of her hair; then the girl got up and went in the kitchen with her mother, and that was the last time I saw her; and then the other girl got up out of bed, the youngest one, and came over to the stove and taken another drink out of the bottle with Mr. Casteel and Mr. O'Dell and myself.''

"Mr. Casteel said breakfast was ready. . . . And for us to come in and get breakfast, and I said 'No, we have done ate breakfast at Mr. Connley's;' and Mr. Casteel went in to eat breakfast and he was gone a very short time and he came back in the room that we were in. . . . Everything was friendly up to the time of breakfast. . . . Mr. Casteel seemed to think we did not want to eat with him. . . . We asked Mr. Casteel if he was going to eat any breakfast and he said, 'No, I am not going to eat anything.' So Mr. Casteel and Mr. O'Dell got to arguing. They were arguing about who could kill the most birds. Mr. Casteel said, 'I can kill four out of five.' Emmett said, 'I can beat you shooting birds.' Then they had another drink of whiskey. About that time it was getting daylight. Mr. Casteel went into the kitchen to eat some breakfast. Emmett followed him in there and I went in and tried to get him to come out and let Mr. Casteel eat his breakfast. When Mr. Casteel came out of the kitchen he had his gun. He says these words, 'No man can come into my house because they have got guns and raise hell with me and think they are going to put me on the spot.' . . . I told Mr. Casteel and Emmett O'Dell not to argue, tried to talk them out of it and they did. They taken another drink of whiskey; Mr. Casteel sat his gun down. Mr. Casteel and Emmett then taken another drink and the argument started over. . . . Mr. Casteel said, 'This gun has killed everything but a man.' . . . I walked over to Mr. Casteel and put my hand on his shoulder and I said, 'Now, dad, we came here on business; we are in here to look over this land,' and Mr. O'Dell said, 'Yes, and I am paying you three dollars for you to go out with us today,' and Mr. Casteel said, 'That is right.'

"Mr. Casteel set his gun down at the foot of the bed and he seemed to be getting his overall jumper on preparing to go, and then he picked up his gun again, and I walked over between him and Mr. O'Dell, and I told him, I said, 'Come on; let's go; it is getting daylight,' and I said, 'Let's go out and look over this land and do what

we are supposed to do,' so Mr. Casteel, he got mad and commenced cussing and using profane language. . .. . I told the old man he didn't come here for no trouble, we come here peaceably and we wanted to go away peaceably. . . . Mr. O'Dell and I—we went out the door, and Mr. O'Dell was ahead of me, and . . . he picked up his double-barrell twelve-gauge hammerless shotgun and called his dog, and I pulled the door behind me as I went out, and we supposed that Mr. Casteel would come. . . . We had our backs to the door which we came out, and Mr. Casteel came to the door and pulled it open, and said, 'I will blow your God damn brains out.' At the same time Mr. O'Dell and I turned around, and as we turned facing each other towards the house, and I grabbed the twelve-gauge double-barrel hammerless from Emmett's left hand with my right. I saw Mr. Casteel in the door, and at the same time he was raising his gun, and when Mr. O'Dell saw it he pulled his service '.38.' . .. . He pointed it away from Mr. Casteel, towards the ground, not at the door at all, at the same time I made a pass to get ahold of Mr. Casteel's gun, but just as I had my hand close enough that I could feel the gun and then still not move it he shot it over my left shoulder, past my head, and stepped back in the house . . . After Casteel had fired at O'Dell he asked his son to load up the gun and not let me get away.''

Casteel's version, as a witness for defendants, was that he shot O'Dell to protect himself and his family. He said that, on Tuesday afternoon, O'Dell had arranged to meet him on the highway at nine-thirty the next morning to look over the east valley on the land; that he had not agreed to pay him anything; but that he said he would bring his dog and gun and they would kill some quail. He said O'Dell came to his house ''the next morning between three-thirty and four o'clock with a man he did not know. He further testified, as follows: ''My two daughters were laying in bed; they hadn't got up; and he put a pint of whiskey between them and a pistol, and he commenced feeling of my daughter's hair and he pinched her in the back and she got up and got away from him, went to the kitchen, and the next girl, she got up and went in the kitchen; . . . by that time I had got up and got my clothes on and they passed the bottle. . . . He followed my daughter, Marie, and they made him get out of there, and he said, 'Old man, you are getting hard,' and I said, 'No, I guess not.' 'Yes,' he said, 'I think you are.' He said, 'I am tough,' and he had his gun in his hand; Brookey had a gun in his hand. .. . . They were pistols. . . . He said, 'Old man, you needn't to get hard,' he said, 'I am bad,' he said, 'I will take you to the spot.' I told him, 'No, I wouldn't do that.' I talked to him and tried to get him to go and get in his car and go home. I told him I didn't want no such carrying on at my place like that;

and he didn't say nothing much more, but he kept showing me his gun and what he would do. . . . I taken two little drinks out of the bottle. . . . I asked him to go on home. . . . He said, 'Old man, I was never run out from a place; I am tough and I ain't leaving.' I took him by the arm and he broke loose from me. I took him to the car door and told him to get in it and he took up his gun and was going to shoot me and I ran for the house. He took up a pistol. . . . He said, 'I am going to kill you,' and when he said that I run back in the door and grabbed my gun and shot him. He had his gun on me and I knocked it away and he shot about a foot and a half above me in the weatherboard."

Defendants also offered in evidence the transcript of the testimony taken at the coroner's inquest. Lorentz, Casteel and other members of Casteel's family testified there. The Casteels' testimony substantially corroborated the testimony of Casteel at the hearing on the compensation claim. The prosecuting attorney testified that he filed no charges because he thought the testimony before the coroner showed "self-defense," and he "reached the conclusion that he couldn't make a case." It was not disputed O'Dell fired one shot from his pistol, and that Casteel fired one shot from his shotgun. According to Lorentz, Casteel shot first. Casteel's son said, at the inquest, that he "grabbed" Lorentz to keep him from shooting his father. Casteel had served a term in the penitentiary for assault with intent to kill.

If O'Dell either went to Casteel's house for purposes of his own, or being there on his employer's business, temporarily stepped aside from the work of his employer to accomplish a purely personal purpose out of which the quarrel arose, claimants would not be entitled to an award of compensation. We think it is apparent that if Casteel's version was true, O'Dell did not come out to Casteel's house at three-thirty A. M. on any business of his employer, but went there for purposes solely his own; and that the quarrel, which resulted in his death, was commenced by him in the furtherance of his own inclinations and desires and had no relation or connection whatever with his employer's affairs. [See Beem v. H. D. Lee Mercantile Co., 337 Mo. 114, 85 S. W. (2d) 441, and cases cited; State ex rel. Gosselin v. Trimble, 328 Mo. 760, 41 S. W. (2d) 801; McMain v. Connor & Sons Const. Co., 337 Mo. 40, 85 S. W. (2d) 43; Mullally v. Langenberg Bros. Grain Co., 339 Mo. 582, 98 S. W. (2d) 645.] However, the commission did not have to accept that version. It had the right to, and evidently did to make its finding, reach the conclusion that the facts were as stated by Lorentz; and that they went to Casteel's house solely on the employer's business. From his testimony, it would be reasonable to find that O'Dell was not the agressor, did not intend to start a quarrel, and did not know that Casteel would assault him. It may be conceded that, even from his testimony as

to what was said and done, it might be possible to reach two opposite conclusions as to O'Dell's intentions and purposes; one of improper purposes of his own, for which he temporarily stepped aside from, and was not at the time he was shot, engaged in, activity related to his employer's business; and one of an attempt primarily to carry out the mission he was directed to perform to advance his employer's interests, to which his conversation and conduct as to irrelevant matters was merely incidental. If the latter was his purpose, he would be acting within the course of his employment, even though he chose the wrong methods to do it, and failed to attain the result sought, because his "duties invested him with the authority to make the decision for defendant" as to methods. [See State ex rel. Gosselin v. Trimble, 328 Mo. 760, 768, 41 S. W. (2d) 801; Haehl v. Wabash Railroad Co., 119 Mo. 325, 24 S. W. 737.] If the question was one for the trier of the facts, they could make this latter inference if it was a reasonable one to make after considering all the evidence. "Whether the act was or was not such as to be within the employment's scope is ordinarily one of fact for the jury's determination. But if the departure from the employer's business is of a marked and decided character the decision of the question may be within the province of the court." [State ex rel. Gosselin v. Trimble, supra.] We hold that this question in this case was for a trier of the facts. We also hold that the inference of intent to serve his employer's purpose was a reasonable and proper inference, although not the necessary or only inference, for them to make, and we must assume that the commission did make it and did base its findings on it. [Phillips v. Air Reduction Sales Co., 337 Mo. 587, 85 S. W. (2d) 551; State ex rel. Probst v. Haid, 333 Mo. 390, 62 S. W. (2d) 869; State ex rel. Buttiger v. Haid, 330 Mo. 1030, 51 S. W. (2d) 1008.]

 It was the purpose of the Compensation Act "to extend the protection of the law to all employees . . . while at any place where their services, or any act, task or mission which forms a necessary part of their services, may reasonably require them be." [Wahlig v. Krennig-Schlapp Grocer Co., 325 Mo. 677, 29 S. W. (2d) 128; Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601; Beem v. H. D. Lee Mercantile Co., 337 Mo. 114, 85 S. W. (2d) 441.] It is not disputed that O'Dell was instructed to go to this tract of land. There was certainly substantial evidence that his instructions were to contact the squatters thereon, to try to make friends with them, and to obtain their good will and cooperation. It is not even an unreasonable inference that one of the methods contemplated was, at least on some occasions and under some circumstances, to take a drink with some of them, as a method of approaching the attainment of these objectives. Nor is it entirely unreasonable to believe that the employer knew that there might be some

turbulent characters among squatters and that there might be some hazard in dealing thus with them. Certainly if O.'Dell thought that he could better induce Casteel to show him over the land and gain his good will by the inducement of liquor and of quail shooting on the way, the fact that he might have also enjoyed the liquor and the sport of hunting quail would not make the whole trip solely his own. Since O'Dell was given discretion as to methods, it is proper to consider whether what he said and did could have advanced the object his employer had in view, and, in doing so the character of the man he was dealing with, as shown by the evidence, should also be considered.

His purposes, in going to Casteel's house, clearly could be within the test for determining what is a trip in the course of one's employment, stated the McMain case, namely: "If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. . . . . If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk." His conduct, at Casteel's house, could likewise come within the test laid down in State ex rel. Gosselin v. Trimble, supra, and cases cited, namely: "The fact that the act was done during the time of the servant's employment is not conclusive, nor is the motive of the servant so. The question is, was the act done by virtue of the employment and in furtherance of the master's business? [Hinkle v. Railroad, 199 S. W. 227.] 'Whose business was being done and whose general purposes were being promoted?' [Maniaci v. Express Co., 266 Mo. 633, 182 S. W. 981.] Was the servant acting in the line of his employment, about his master's business and seeking to accomplish his master's purpose?" The question is not whether his employer would have approved his methods, but whether they came within the discretion given to him. O'Dell may have been too vehement in boasting to Casteel of his shooting ability, he may have been too antagonistic in his argument about this and other matters, and he may have gone further in his use of whiskey than his employer intended. Nevertheless, we canot say that it conclusively appears, under the view of the evidence most favorable to claimant, that he was attempting to start a fight; that he expected what he said or did to cause Casteel to do so; or that he was doing any more than carrying out his own ideas as to how his mission, to make friends with squatters and find out about the land from them, should be accomplished. In other words, there was a question for the trier of the facts as to whether he was the victim of ill-chosen and misinterpreted methods

for accomplishing his employer's purpose, or as to whether the fatal quarrel was the result of an attempt to accomplish an improper purpose of his own. [For assault cases generally, see Keithley v. Stone & Webster Engineering Corporation, 226 Mo. App. 1122, 49 S. W. (2d) 296, and cases cited; Schneider on Workmen's Compensation, secs. 293-294, and supplements thereto.] Our conclusion is that the facts shown by claimant's evidence, together with the reasonable inferences that might be drawn therefrom favorable to the claimant, constituted substantial evidence to support the finding of the commission that O'Dell died from an accident that arose out of and in the course of his employment.

The judgment is affirmed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur..