Wayne Everett GINGELL, Respondent,

v.

**WALTERS CONTRACTING CORPORATION and American Surety Company of New York, Appellants.**

No. 22592.

Kansas City Court of Appeals. Missouri.

May 6, 1957.

--- ◆ ---

Robert S. McKenzie, Stubbs, McKenzie, Williams & Merrick, Kansas City, for appellants.

Roy A. Larson, Jr., Sprinkle, Knowles & Carter, Kansas City, for respondent.

CAVE, Judge.

This is an appeal from a judgment of the circuit court affirming an award of the Industrial Commission of $29.99 for necessary medical aid, 240 weeks' compensation at $30 per week, and $500 for disfigurement, or a total of $7,729.99. The compensation is payable weekly, beginning April 29, 1953, and at the time of the appeal there was due and payable 157 weeks' compensation, together with the special amounts for medical aid and disfigurement, or a total of $5,239.99. The appeal was originally taken to the supreme court, but that court sustained a motion to transfer the cause to this court.

The basis for this order of transfer is that it does not affirmatively and definitely appear that the amount involved exceeds $7,500, as required by Art. V, Sec. 3, Constitution of 1945, V.A.M.S. In deciding the question of jurisdiction in an identical factual situation, the supreme court, in Hogue v. Wurdack, 292 S.W.2d 576, held that it did not have jurisdiction because the claimant might die, without leaving dependents surviving, before a sum in excess of $7,500 had accrued.

This cause was initiated by claimant, Gingell, filing a claim for compensation against the Pipemasters Construction Corporation, alleging that he was injured in an automobile accident while employed by such corporation. He subsequently filed an amended claim joining, as an additional employer, the Walters Contracting Corporation. When the cause came on for hearing before a referee of the Division of Workmen's Compensation, the claim against Pipemasters was dismissed by the claimant, and the cause proceeded to trial against the Walters Corporation. The referee denied compensation because the disability was not the result of "an accident arising out of and in the course of the employment * * *".

Upon review the commission found, among other things, that Gingell "was the actual employee of Walters Contracting Corporation on April 29, 1953, * * *"; that on that date he sustained an accident, "arising out of and in the course of his employment as an actual employee of Walters * * *", and reversed the award of the referee and made the allowances referred to supra. The circuit court affirmed the commission's award, and Walters Company and its insurer perfected their appeal.

They contend that the court and the commission erred: (1) in holding that Gingell was an employee of Walters Company; and (2) in holding that the accident arose out of and in the course of his employment.

The facts relating to both issues are unusual, and no similar case having been decided in this state, we shall detail the evidence at greater length than usual.

Walters Company argues that the evidence establishes that Pipemasters Company was its subcontractor; and that Gingell was an employee of Pipemasters at the time of the accident; consequently, Walters is not liable under the compensation act.

The evidence on this issue is substantially as follows: Walters Company was a New York Corporation, licensed to do business in this state; that it contracted with the Corps of Engineers of the air force to install certain piping and tanks on the Air Force Base located near Knobnoster, Missouri, sometimes referred to as the Sedalia Air Base; that the officers and sole stockholders of the Walters Company were Edward J. Walters, president, Janet Walters, his wife, vice president, and Louis Kohl, secretary-treasurer; that the officers and stockholders of Walters Company incorporated the Pipemasters Company; that it "was set up for the operating convenience of Walters Contracting Company with respect to employing (union) members of the pipe trades * * *"; that Pipemasters had no "formal contract" as a subcontractor with Walters; it owned no property or assets; its sole purpose and function was to contract with the labor union to supply pipe fitters—"We had to use the device of a separate corporation to hire the men"; so states Leo Kohl, superintendent for Walters Company.

After Walters contracted with the air force, it sent Leo Kohl, son of Louis Kohl, from New York to Missouri to superintend the work to be done under the contract.

He was sent by Walters Company; he was its superintendent, as well as a stockholder; and all the employees on the job were under his supervision and control. He called the union office and asked that a number of pipe fitters be sent onto the job, and Gingell was one of those who was given a referral "slip" or written direction to report to Leo Kohl at the air base. Gingell did not remember whether this written direction was in the name of Pipemasters Company or Walters Company, and the instrument itself was not produced in evidence. He did report for work, and received his orders and directions from Leo Kohl.

In addition to Leo Kohl, the Walters Company had in its office at the air base a Mr. Henderson, who was general office manager. He prepared the weekly payrolls which, according to an exhibit introduced, originally had the printed name of "Walters Contracting Corp." as its caption, but on this exhibit the words "Walters Contracting" had lines drawn through them and inserted "Pipemasters Const. Corp.". Leo Kohl and Henderson both testified that this weekly payroll was made out in the name of Pipemasters and sent to Walters Company in New York; that Walters Company would forward a check to them payable to Pipemasters; that the check would be deposited in the bank at Knobnoster in the name of Pipemasters, and then the pay checks drawn against that account; that Pipemasters had no other property, assets, income, duties or responsibilities in connection with the work being done at the air base; and that all other expenses incurred in connection with the work were paid directly by Walters; that the tools and instruments used by the workers were owned and furnished by Walters Company. Leo Kohl was asked,

"Q. In what capacity were you acting for the Pipemasters Construction Company? A. I was acting for Walters Contracting Corporation and any efforts that I made in behalf of

Pipemasters Company were also representing the best interests of Walters Corporation, so that I was acting in a dual capacity, even though I was employed solely by Walters Contracting Corporation * * * I guess I could be considered as acting as their (Pipemasters') agent, although there was never any formal letter or appointment to that effect. I was primarily out there to see that the job was completed, whether I acted as an agent for Pipemasters * * * or the superintendent of Walters Contracting Corporation * * *.

"Q. There is no written contract between Walters Contracting Corporation and Pipemasters Corporation? A. No, * * * there is no contract. In fact, there were no terms of compensation agreed to * * *.

"Q. Do you know, Mr. Kohl, whether or not the Pipemasters Construction Company has any income at all? A. No, sir, it has no income at all, just acts as an agency for transmitting money from Walters Contracting Corporation to the men that are employed by Pipemasters * * *.

"Q. And any profit that is made out of the work of these men on the payroll of Pipemasters * * * is actually made by the Walters Contracting Corporation? A. That is right. * * *

"Q. Has the Pipemasters Company ever entered into a contract with anyone for any type of construction? A. No, sir, never has."

■ From this evidence, we think it is perfectly apparent that Pipemasters was not a "subcontractor" of the Walters Company within the usual and accepted meaning of that word. The most that can be said is that the sole function of Pipemasters, as an agent, was to arrange with the labor union for the supply of certain workmen, and to act as paymaster of those specific workmen, for Walters. Pipemasters had no authority or obligations concerning the work to be done. The workmen were under the exclusive direction and control of Leo Kohl, who was Walters' general superintendent.

■ The right of control is an important factor in determining the question of whether the relationship of employer and employee exists. Glynn v. M. F. A. Mut. Ins. Co., 363 Mo. 896, 254 S.W.2d 623, 36 A.L.R.2d 256. The test of existence of the relationship is the right to control the means and manner of the service as distinguished from controlling the ultimate results of the service. Coy v. Sears, Roebuck & Co., 363 Mo. 810, 253 S.W.2d 816. Of course, the fact of control standing alone is not conclusive, but we have detailed other facts which lend support to the conclusion that Walters Company was the real employer.

The rapidity with which Leo Kohl seeks to shift his affiliation from Walters to Pipemasters should not blind us to the true factual situation. Pipemasters did not have sufficient employees (if it had any at all) to come under the compensation law, but Walters Company is under the Act. It has been held that one of the purposes of Sec. 287.040 RSMo 1949, V.A.M.S., is to prevent an employer from avoiding liability for accidents occurring in the course of the operation of his usual business by resorting to the fiction of contracting for the doing of his work with persons of no financial responsibility. Gholson v. Scott, Mo.App., 130 S.W.2d 216, 219; Baker v. Iowa-Missouri Walnut Log Co., Mo.App., 270 S.W.2d 73, 78; De Lonjay v. Hartford Accident & Indemnity Co., 225 Mo.App. 35, 35 S.W. 2d 911, 912.

We hold that there is substantial evidence to support the finding that Gingell was, in fact, an employee of Walters Company. To hold otherwise would be emasculating the broad and beneficial purposes of the com-

pensation act, which must be given a liberal construction.

The most serious question is whether there is substantial evidence to support the finding that the accident, resulting in injuries to the employee, arose out of and in the course of his employment. The evidence on this issue is:

The employee lived in Kansas City, Missouri. His work was at the air base, approximately 60 miles from his home; he was injured in an automobile accident on Highway No. 50 approximately 40 miles from the air base; he was an hourly employee, as a welder, and had no duties to perform except at the work site; he had rented a room in Warrensburg, about 18 miles from the air base, but he had not used this room at the time of the accident; he had worked but two days, on a Monday and Tuesday, and on each day he had driven to and from his home in Kansas City. On Wednesday morning, when he reported for work, it was raining, and Leo Kohl advised all the employees that there would be no work that day but to report the following morning. Under the union scale contract of employment, Gingell was to receive $2 for "show up time", or for reporting for work; and was also to be paid $3.20 per day "travel expense". However this $3.20 was paid to each workman without regard to where he lived, or the distance he had to travel. That amount was arrived at on the basis of the distance of the *work site* from the union hall in Kansas City. Gingell used his own automobile for transportation.

After the work had been cancelled on Wednesday morning, a number of employees were standing around in the office of the employer and Leo Kohl asked if anyone was going to Kansas City. Gingell replied that he was, and "he (Kohl) asked me if I would pick up some tarpaulins at Kansas City and bring them back the next day, and I said I would.

"Q. He asked you to pick up these tarpaulins in Kansas City? A. Yes, either English Brothers or another place, I have forgotten now.

"Q. Did he instruct you as to how to pay for them? A. He told me to pick them up, and sign a ticket, one of them tickets with a construction company, it would be mailed by check, I guess, paid to them later on.

"Q. He told you to sign for them? A. Yes, * * *

"Q. Do you know what they were to be used for? A. To cover some machinery, the welders, you know, to keep from getting wet or to cover something on the job."

At about the same time, a Mr. Treu, an employee of Walters Company out of its New York office, stated that he wanted to return to New York that afternoon and asked Gingell if he would take his two bags to the airport in Kansas City and check them in his name, and Gingell consented to do so.

Gingell also testified that in going from his home to the air base or returning from the air base to his home, he ordinarily travelled over U. S. Highway No. 40, which "comes in about six blocks from my house". But relative to the trip on the day of the accident, he was asked: "Q. Why did you take Highway No. 50 on that day? A. To miss the traffic and go over the new trafficway to the airport. * * * To miss all the downtown traffic. Q. (In) What order were you going to do the jobs that you had been told to do? A. English Brothers is over here on Fifth, right off the trafficway, and we would stop there and pick up the tarpaulins * * * and go on to the airport and check the baggage".

Leo Kohl testified that he requested Gingell "to telephone the Mid-State Supply Company and have them deliver it (tarpaulins) * * *. Q. And you had asked him to do it as a favor to you, to order this * * sent out because you needed it out there on the job, didn't you? A. That is right."

It is clear that Gingell had completed his regular employment at the air base; and that the contemplated return trip to his home in Kansas City would have been for his own convenience. However, he contends that because Kohl and Treu requested him to perform certain services in Kansas City, in behalf of and for the benefit of Walters Company; and that to do so he used a different and more convenient highway to perform such services than he would have used if he had gone directly to his home; therefore, the accident arose out of and in the course of his employment. The employer contends the contrary.

■ The general rule is that the hazards encountered by employees while going to or returning from their regular place of work, before reaching or after leaving the employer's premises, are not ordinarily incident to the employment, and for this reason, injuries resulting from such hazards are in most instances held not to be compensable as arising out of and in the course of the employment. However, this general rule is subject to certain well recognized exceptions which depend upon the nature, circumstances, and conditions of the particular employment, and the cause of the injury. Garbo v. P. M. Bruner Granitoid Co., Mo.App., 249 S.W.2d 477, 479, and 58 Am.Jur., Workmen's Compensation, Sec. 217, page 723.

In the instant case, we are confronted with the application of what is generally referred to as the doctrine of a dual-purpose trip. This doctrine has been a prolific and troublesome question for the courts in determining whether an accident arose out of and in the course of the employment. Time and space will not permit a review of the many cases discussing this matter, but for a general discussion of the question, see Larson's Workmen's Compensation Law, Vol. I, Sec. 18.11 et seq.

The landmark case which has been cited more frequently than any other is Marks' Dependents v. Gray, 251 N.Y. 90, 167 N.E. 181, 183. In that case, a plumber's helper who was going to travel to a neighboring town to meet his wife, was asked by his employer to fix some faucets there—a trifling job which would not in itself have occasioned the trip. The employee was injured on the way. In denying compensation, Judge Cardozo announced this formula: "We do not say that service to the employer must be the sole cause of the journey, but at least it must be a concurrent cause. To establish liability, the inference must be permissible that the trip would have been made though the private errand had been cancelled. * * * The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. * * * If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk". This language is approved and applied in O'Dell v. Lost Trail, Inc., 339 Mo. 1108, 100 S.W. 2d 289, 293.

Some of the decisions have construed this doctrine to be applicable only when the *primary purpose* of the trip is on the employer's business, or sometimes referred to as the "dominant purpose" test. Judge Cardozo used no such language. He said it was sufficient if the business motive was a *concurrent cause* of the trip. He then defined "concurrent cause" by saying that it meant a cause which would have occasioned the making of the trip even if the private mission had been cancelled. As we understand this formula, it is not necessary that, on failure of the personal motive, the business trip would have been taken anyway *by this particular employee at this particular time*. It is enough that some one would have had to make the trip to carry out the business mission. If the trip would ultimately have had to be made, and if the employer got this necessary item of travel

accomplished by combining it with the employee's personal trip, it would be a *concurrent cause* of the trip, rather than an incidental appendage or afterthought. There is no occasion to weigh the business and personal motive to determine which is *dominant*.

In Wineland v. Taylor, 59 Idaho 401, 406, 83 P.2d 988, 990, the court recognizes and expresses this general rule as follows: "* * * if the service of the master was a concurrent cause of the trip, which the servant was taking at the time of the accident, the master would be liable for compensation". See, also, In re Christie, 59 Idaho 58, 76, 81 P.2d 65.

We think this same formula is applicable when an employee, in the course of his normal journey to and from work, performs some *concurrent service* for his employer, and becomes an exception to the general rule excluding off-premises going-and-coming journeys—such as going from his home to his place of employment or returning therefrom to his home. The question then becomes: Was this mission of such character or importance that it would have necessitated a trip by someone if this employee had not been able or willing to handle it in combination with his homeward journey?

We conclude that the services requested by Mr. Kohl and Mr. Treu were of such a pressing need that had not Gingell consented to perform them, then some other person would have been required to make the trip for such purposes. That being true the commission properly found that employee's injuries arose out of and in the course of his employment.

It should also be noted that in the Marks case, Judge Cardozo said (167 N.E. 182): "A different question would arise if performance of the service were to occasion a detour, and in the course of such detour the injuries were suffered". In other words, the opinion indicates that if it had been necessary for the employee, in that case, to have detoured or travelled some highway other than the direct and convenient route to his destination, then the accident would have arisen out of and in the course of his employment. In the instant case, Gingell testified that he had been travelling to and from his home over Highway No. 40; but that because of the requests which had been made by Kohl and Treu, he was proceeding along Highway No. 50, which was a more serviceable and convenient route for him to reach the places where his services were to be performed.

The appellants cite and rely on McMain v. J. J. Connor & Sons Const. Co., 337 Mo. 40, 85 S.W.2d 43. That case does quote from the Cardozo opinion, as we have done supra, but the facts in the McMain case make it inapplicable. McMain, after he had performed the services for which he had made the trip to Kansas City, proceeded, for several hours, to visit places of entertainment, and participate in the night life of the city, and received his injuries in the early hours of the morning while returning to his home. He had long since abandoned any service to the employer. His detouring was for his own purpose and pleasure.

The commission also found that the employee was paid *travel expense* in the sum of $3.20 per day for travel between his home in Kansas City and the air base, and that this fact would entitle him to compensation. It cites Garbo v. P. M. Bruner Granitoid Co., supra. The evidence on this issue is so limited, indefinite and uncertain that we will not decide that fact issue. Because of the result already reached, it is unnecessary to do so. However, there are cases which have held, under certain circumstances, that such transportation allowance was merely a form of added compensation. If that be so, the Garbo opinion would not be controlling. For a discussion

of this question and citation of authorities, See Vol. I, Larson, supra, Sec. 16.30.

The judgment of the trial court, sustaining the award of the commission, is affirmed.

All concur.