Susan COX et al., Appellants,

v.

COPELAND BROTHERS CONSTRUCTION COMPANY and Western Casualty & Surety Company, Respondents.

No. KCD 30114.

Missouri Court of Appeals,
Western District.

Oct. 1, 1979.

Motion for Rehearing and/or Transfer
Denied Oct. 29, 1979.

Application to Transfer Denied
Dec. 6, 1979.

Edward J. Murphy, Butler, for appellants.

Edward W. Mullen, Patrick C. Cena, Deacy & Deacy, Kansas City, for respondents.

Before HIGGINS, Special Judge, Presiding, WELBORN, Special Judge and SWOFFORD, C. J.

SWOFFORD, Chief Judge.

On November 13, 1975, Gerald Cox, husband of Susan K. Cox, and father of Susan Evelyn Cox, a minor, was killed in Saline County, Missouri in an automobile collision while en route from his home in Chillicothe to Marshall, Missouri. Appellants filed a claim for his death under the Missouri Workmen's Compensation Act alleging that the accident resulting in Cox's death occurred while he was within the course and scope of his employment as a plumbing foreman for Copeland Brothers Construction Company (Copeland).

After a hearing, death benefits were awarded by the Referee, but upon review by the Industrial Commission that award was reversed and benefits denied. The Circuit Court of Saline County affirmed the Commission's action and from that adverse ruling appellants bring this appeal.

The sole question involved in this appeal is whether or not the deceased was within the course and scope of his employment at the time of the accident. More specifically and narrowly stated, the issue becomes one of whether the decedent's trip from Chillicothe to Marshall, Missouri invoked the "dual purpose doctrine" and thus rendered his death compensable to his dependents under the Act. In other words, was the purpose of his trip partially his own and partially that of his employer, Copeland Brothers Construction Company. The appellants vigorously assert that the denial of death benefits constituted a misinterpretation and misapplication of appropriate Missouri law in failing to apply the "dual purpose doctrine", that this denial was contrary to the overwhelming weight of the evidence, and that there was not sufficient competent evidence to support the denial of compensation. The respondents argue that the Circuit Court properly sustained the findings of the Commission; that those findings were supported by sufficient competent evidence, and that the award properly applied the law in holding that the "dual purpose doctrine" was inapplicable under the evidence.

■ The general principle is that injuries sustained by an employee while en route from his home to his place of employment are not sustained "within the course and scope" of his employment and are, therefore, not compensable. Certain exceptions to this general rule have been clearly defined by the courts of this state, one of

which is the so-called "dual purpose doctrine". This doctrine in Missouri finds its basic support in the case of *Marks' Dependents v. Gray*, 251 N.Y. 90, 167 N.E. 181 (Ct. of App. N.Y. 1929), in which Cardozo, C. J., held that street risks to which an employee was necessarily exposed while traveling to and from work, unrelated to the service of the employer, did not fall within the ambit of compensable consequences. The court in *Marks* declared that the determination of whether an injury incurred from such a risk was compensable from the employer hinged upon a simple factual basis, l.c. 183 [2]:

"The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own."

The rationale of *Marks* and the cases which follow it, is that if the exposure to the perils of the highway is related to the employment even though the employment is not the sole cause of such exposure to such risks but is combined with or is a concurrent personal cause, the benefit of compensation is not to be withdrawn. *O'Dell v. Lost Trail, Inc.*, 339 Mo. 1108, 100 S.W.2d 289, 293 [5] (Mo.1936); *Corp v. Joplin Cement Company*, 337 S.W.2d 252, 255 [2] (Mo. banc 1960); *Downs v. Durbin Corporation*, 416 S.W.2d 242, 246 [5] (Mo.App. 1967). This principle of workmen's compensation law in Missouri, presently known as the "dual purpose" exception to the "going and coming" or "to and from" rule of exclusion is finely framed in the case of *Gingell v. Walters Contracting Corporation*, 303 S.W.2d 683, 688, 689 [3] (Mo.App.1957), where this court said, l.c. 688, 689:

"Some of the decisions have construed this doctrine to be applicable only when the *primary purpose* of the trip is on the employer's business, or sometimes referred to as the 'dominant purpose' test. Judge Cardozo used no such language. He said it was sufficient if the business motive was a *concurrent cause* of the trip. He then defined 'concurrent cause' by saying that it meant a cause which would have occasioned the making of the trip even if the private mission had been cancelled. As we understand this formula, it is not necessary that, on failure of the personal motive, the business trip would have been taken anyway *by this particular employee at this particular time*. It is enough that some one would have had to make the trip to carry out the business mission. If the trip would ultimately have had to be made, and if the employer got this necessary item of travel accomplished by combining it with the employee's personal trip, it would be a *concurrent cause* of the trip, rather than an incidental appendage or afterthought. There is no occasion to weigh the business and personal motive to determine which is *dominant*." (Emphasis that of the *Gingell* court)

This exposition in *Gingell* of the "dual purpose" exception was declared to be sound, and was followed by the Supreme Court in *Corp v. Joplin Cement Company*, 337 S.W.2d 252, 255–256 [3] (Mo. banc 1960) as in keeping with the rule that the Workmen's Compensation Act should be liberally construed to effectuate its purpose. Both *Gingell* and *Corp* were later followed and reaffirmed by this court in *Downs v. Durbin Corporation*, 416 S.W.2d 242, 246, 247 [5] (Mo.App.1967) and *Cowick v. Gibbs Beauty Supplies*, 430 S.W.2d 626, 629–630 [1, 2] (Mo.App.1968).

Of course, each case involving the question of whether an injury or death of an employee occurs within the course and scope of his employment and is, therefore, compensable, must be determined from the facts and circumstances of that particular case, and this is also true where the resolution of that question involves the "dual purpose doctrine". In the case at bar, such resolution is entirely dependent upon whether or not such doctrine may be properly applied. This Court is, of course, aware of the restrictions ordinarily limiting the scope of appellate review in Workmen's Compensation cases. Such rules are not applicable in this case for the reason that the basic controlling facts are not in dispute and the evidence is not in conflict.

■ This was recognized by the Industrial Commission. As part of its award, it found, "The facts in this case are largely undisputed and the major dispute is a question of law". Indeed, a meticulous examination of the record reveals a complete absence of any dispute as to any material fact. Where facts are not in dispute the question for determination becomes one of law "irrespective * * * of whether it was of law or of fact as presented to the commission below", *Maltz v. Jackoway-Katz Cap Co.,* 336 Mo. 1000, 82 S.W.2d 909, 915 [11] (1935); *Kunce v. Junge Baking Co.,* 432 S.W.2d 602, 606 [3] (Mo.App.1968); *Corp v. Joplin Cement Co.,* 337 S.W.2d 252, 258 [7] (Mo. banc 1960).

■ Under these circumstances, the finding of the Commission in this case, that the trip from Chillicothe to Marshall during the course of which decedent Cox met with his fatal accident, did not arise out of and in the course of his employment and that the "dual purpose doctrine" was not applicable, is not binding upon a reviewing court.

A summary of the evidence reveals that on November 13, 1975, when Gerald Cox met his death, he was 31 years of age and left as dependents his wife, Susan K. Cox, also 31 years of age, and one daughter, Susan Evelyn Cox, aged 9 years. At the time of his death, he was employed by Copeland Brothers Construction Company as a plumber foreman on a number of low-cost housing projects in various communities in north central Missouri. Frequently, two or more of these projects were in progress in various stages and construction at the same time and Cox was in direct charge as foreman for all plumbing installations. He had from 4 to 6 plumbers working under him and he also did work in the actual construction and installation of plumbing on the various jobs.

The company-employer was owned equally by Jerry Copeland and his brother Gene Copeland, who were also the managing officers. The company maintained an office and warehouse at Chillicothe, Missouri and also a business office in the Kansas City area, and both the Copelands and the Cox family made their homes at Chillicothe, as did many of the company's employees, including the plumbers working under Cox. All of the plumbers, including Cox, worked upon an hourly wage basis for time actually spent on the job sites and the company furnished no transportation or mileage payments to Cox and his men to and from the job sites and their homes.

The evidence established that in addition to the manual plumbing work which Cox performed at the construction sites he was furnished a set of plans and specifications on each job; he initially assisted Jerry Copeland in figuring bids on various jobs either at his or Copeland's home at Chillicothe at night or other times when not working; and on jobs undertaken he would also spend time at his home or Copeland's working on the plans and specification book and mark his set for changes or corrections. Minor changes he would go ahead as foreman and make them, but major changes involving use of parts other than those specified or involving an increase in cost would require the architect's approval and would always be discussed with Jerry or Gene Copeland, who would undertake to obtain such prior approval. The set of plans and specifications used by Cox as plumbing foreman with the changes noted formed the working basis from day to day on the various jobs. In addition to these functions, Cox would frequently meet with his men in Chillicothe at night and give them instructions for the next day's work on a particular job when he would not be physically present at such job because of duties elsewhere on other job sites. While most of the materials for the various jobs were delivered at the job sites by the suppliers, it was part of Cox's responsibility to see that needed plumbing material was available when needed on the job, and he was supplied a key to the company warehouse at Chillicothe and upon occasion stopped there in the early mornings while en route to the job to pick up needed material or company tools and equipment. He was not paid for transportation or for these efforts performed after or before work hours at Chillicothe.

In addition, Cox was subject to call from one site to another during work hours in case of emergencies or when his services were needed at another job. He was paid his regular wage on these occasions for the time consumed in transportation (sometimes substantial distances) and for time spent at the place to which he was directed. These duties sometimes occurred after regular work hours and on those occasions he was paid extra-time wages. There was also evidence that part of his duties was to keep time records on his men since the job sites did not have time clocks.

On the day of Cox's fatal accident, he was driving his pickup truck from his home in Chillicothe to Marshall, Missouri where one of Copeland's projects was under construction. One Charley Duncan, another employee of Copeland, was riding with him, according to the testimony of Mrs. Cox.

Wayne Cunningham, Jr., who had worked under Cox for approximately a year as an assistant plumber and who succeeded Cox as foreman, testified that he frequently rode with Cox to the job sites and that Cox carried company equipment in his truck, such as pipe or drainage fittings, and other material and tools, and always had his set of working plans and specifications in his truck, and that Cunningham frequently consulted Cox on the job with reference to the plans and specs and the changes that Cox had made thereon.

Following the accident and on the same day, Cunningham and Jerry Copeland went to the garage where the Cox truck had been towed and secured the material, tools, plans, papers and "stuff" which had been in the truck. These were taken to the Cox garage in boxes. He stated that Cox had strikers, hole saws and drills belonging to Copeland and a small personal tool box, in addition to the customary fittings, etc. He stated that these were later separated and divided as to Cox's and Copeland's ownership. When Cunningham found that Cox's plans and specs had been left in the Cox garage, he went to get them, and this testimony appears:

[Direct Examination of Wayne D. Cunningham, Jr. by Mr. Murphy:]

"Q. Later on did you need those plans?
A. Yes, sir.
Q. Why?
A. Well, I had to have those plans to have an idea of the fittings that had been used before.
Q. Didn't the Copelands have a set of plans? Why did you use Cox's plans?
A. They were the ones he had worked with and had various markings on them and on some of them there would be amounts of fittings.
Q. You mean markings Cox had made in conjunction with those the architect authorized?
A. I presume, yes.
Q. Is it a fair statement to say, sir, that if those plans were not on a job site that somebody would have to go get those plans?
A. It could be possible, yes.
Q. How would you know what you were doing unless these plans were produced at the job site?
A. You would have to borrow someone else's or write a new list. *It would be like starting over.*
Q. What about the spec book? Is that of any importance?
A. It is to the plumber.
* * * "

(Emphasis added)

"Q. Why would you need Cox's spec book?
A. Because it was the one he worked with.
* * * * * *
Q. If work had been authorized by the architect, changes and so on marked on the blueprints, wouldn't you have to have the blueprints to find out what the changes were?
A. Yes."

When Cunningham was being interrogated as to the various markings on the Cox blueprints, this appears:

"REFEREE: If you can answer the question—if you know why they were there and who put them there.

A. Being involved with plumbing, I would know why they were put there. I took over the job for a week while Mr. Cox was on vacation and *I had to have these prints.*" (Emphasis added)

\* \* \* \* \* \*

Q. (By Mr. Muprhy) If you had a set of blueprints without the plumber's changes marked on them as shown in this exhibit, would you have to go back and start over again?

A. \* \* \* if a plumber didn't have this and know this change was made, *he possibly would put his piping in the wrong spot.*" (Emphasis added)

Jerry Cunningham testified that a copy of the plans and specifications were kept in the company office and were available; that these were called "as built" and during the course of a job the major changes requiring the architect's approval would show thereon. The set used by Cox would show his minor changes, day to day, and eventually both sets would be completed to show "as built" upon completion. He stated that the plumbing foreman "*needed a set of prints in order to do the work*". While he "welcomed" Cox's work on the plans, he was not paid for that. The following appears in Mr. Jerry Copeland's testimony:

"Q. Was Gerald Cox good at bringing such things (changes in plans) to you attention?

A. He was one of the best employees we have ever had.

\* \* \* \* \* \*

Q. What I am getting at, are you telling this Referee that the set of plans Mr. Cox had in his possession had no value to Copeland Brothers as of the morning of Mr. Cox's death?

A. Yes, they had some value.

Q. What value?

A. Any item on here that was a minor change would have helped the plumbing foreman who assumed Mr. Cox's duties. It would have helped him to see if there had been any minor changes. Any major changes would have been so noted, the change order or letters to the architect or on our as-built drawing, which we have to keep according to the plans and specifications."

Further, Jerry Copeland testified:

"Q. You talked about Cox not being paid for over-time or extra work or things of that nature.

A. No, he was paid for a lot of extra time. Now, the times he spent with me going over this stuff he didn't charge me for.

Q. He could have?

A. *He could have.*

Q. *But he didn't?*

A. Yeah.

Q. It wasn't within the scope of his employment?

A. No.

Q. That wasn't part of his job?

A. He helped me because he wanted to help me the same as I loaned him tools. It worked both ways.

Q. Why did you give him a set of plans he could make minor changes on?

A. For his own convenience.

Q. It was to help you, wasn't it?

A. In the long run it helped me, but it was not part of his job to work on them at night and not get paid for it. *He done this because he was a conscientious worker.*

Q. *You knew he was doing it?*

A. *Yes.*

Q. *You and he worked on it together?*

A. *Yes.*" (Emphasis supplied)

The whole record in this case leads to the irresistible conclusion that it was necessary for the progress of the Marshall, Missouri job of the employer that the corrected and changed plans and specifications be made available upon the job site upon a day to day basis. This does not mean (and no one claims) that had these corrected

plans of Cox's been destroyed that the job could not be completed but only under the necessity to "start all over" as to changes and only at the expense of considerable loss of time and presumptively profit to the employer. Neither will the record disclose any fact other than that Cox was a hard-working, conscientious, dedicated employee, who spent considerable time while not actually on a job in his employer's interest and in an endeavor through his work upon the plans and specifications to keep the construction jobs upon a current and ongoing basis with reference to the plumbing. It is, of course, readily conceded that one of the purposes of his trip from Chillicothe to Marshall, Missouri, which resulted in his death, carried with it a personal reason—he wanted to get to work. But it was clearly, as a matter of law, a dual cause for this trip, a dual service accomplished thereby for his employer. As declared in *Gingell*, supra, it is not incumbent upon either the claimants or this Court to determine which cause was the dominant cause. If they were concurrent causes, as they clearly were, the dual purpose exception must govern and find significant application upon this record.

This Court is reaching the conclusions here expressed is mindful of the legislative admonition that the terms of the Workmen's Compensation Act shall be liberally construed with a view to the public welfare. This statutory provision is to be given great weight. The area where public welfare ceases to be a general, vague term, as here applied, becomes immediately clear by the judicial pronouncements throughout the years that the Workmen's Compensation Act is calculated to relieve the burden of workers incapacitated by injuries or dependents deprived of support by death from the public and place that burden where it properly belongs, upon industry. Further, the mandate for liberal construction means that the benefits should be extended to the largest possible class of workers and the denial of those benefits should be decreed to the smallest possible class. *Hickey v. Board of Education*, 363 Mo. 1039, 256 S.W.2d 775, 777 [2–5] (1953); *American Oil Company v. Pierce*, 472 S.W.2d 458, 462 [5] (Mo.App. 1971).

Considering the character of and all of the circumstances surrounding decedent's employment and the particular facts and circumstances of this case, the judgment of the Circuit Court herein is reversed and the cause remanded to said court with the direction that it, in turn, remand the case to the Industrial Commission of the State of Missouri with directions to reinstate the award to the dependents of the decedent entered by the hearing Referee in this matter.

All concur.