**Alonzo WILLIAMS, Appellant,**

**v.**

**TRANSPO INTERNATIONAL, INC. and Great Western Casualty Co. and Treasurer of Missouri, Respondents.**

**No. WD 40153.**

Missouri Court of Appeals, Western District.

June 28, 1988.

Thaine Q. Blumer, Kansas City, for appellant.

William L. Webster, Cynthia L. Sudduth Turley, Attorney General's Office, Jefferson City, for respondents.

Before SHANGLER, P.J., and LOWENSTEIN and GAITAN, JJ.

GAITAN, Judge.

The plaintiff-appellant, Alonzo Williams, appeals a determination by the Labor and Industrial Relations Commission adverse to him relative to a worker's compensation claim. He alleges that the commission erred in the following respects: (1) that the commission's finding that his injury did not occur during the course and scope of his employment is not supported by the facts or the evidence; (2) that its finding that the appellant knew that his friend, Willie Johnson, was not a qualified driver under the terms of his lease arrangement is not supported by the evidence; (3) that its finding that he had no authorization to select a substitute driver is inconsistent with the facts and ignores the applicability of the mutual benefit doctrine. We affirm.

Mr. Williams was hired by Transpo as a driver. His duties were to deliver loaded trailers from one location to another. At the time he was hired, Williams entered into a lease agreement with Tiger Resources, Inc., by which he acquired a tractor to operate in the service of Transpo. Though Tiger Resources, Inc. retained ownership of the tractor, the vehicle was licensed in Transpo's name. One provision of this agreement allowed Williams to hire other truck drivers to drive the vehicle he leased, provided such other drivers met the same requirements that Williams was required to meet in order to operate the tractor. Additionally, the lease required Williams to obtain written consent from Tiger Resources before hiring any other driver.

Early in November, 1984, Williams was sent by Transpo to Denver, Colorado to deliver a load. Before leaving for Denver, Williams informed Transpo's dispatcher, Bill Sobotka, that he had to be in Kansas City on November 12, for a doctor's appointment. For the return trip to Kansas City, Williams was assigned a brand new freight liner truck which he had not operated before. On his way to Kansas City, Williams stopped at Transpo's terminal in Limon, Colorado, where the dispatcher instructed him to contact Sam Simonian, the manager of Transpo's Kansas City terminal, upon his arrival in Kansas City. Mr. Williams repeated his desire to be in Kansas City on Monday, November 12.

When Williams arrived in Kansas City, he dropped his trailer off at the terminal and drove the truck without a trailer to his home. Transpo's company policy allows drivers to drive their trucks home from work but they are not authorized to drive the truck for any other personal purpose.

About noon on Sunday, November 11, Williams left his home for the terminal where he was to meet with Sam Simonian. When he arrived at the terminal, no one was there. Therefore Williams went to the Metro Truck Stop to use the phone to call Mr. Simonian. Mr. Williams testified that Simonian told him that he could go home, but to return to the terminal first thing in the morning. Mr. Williams told Simonian that he could not work that next day. Mr. Simonian again told Williams to get to the terminal early, and that "we will take care of it." Mr. Williams' conversation with Simonian occurred at approximately 2:00 o'clock in the afternoon.

After speaking with Simonian, Williams remained at the Metro Truck Stop for two or three hours, talking to other drivers and drinking soda. Eventually, he left and drove East on I–70 to get some fuel for his truck, but changed his mind and turned around before reaching the station. Mr. Williams then headed in the direction of his home. His normal route to get to his house from I–70 was to exit at 23rd Street. However, on this occasion Williams exited at 27th Street, having decided to stop at Willie Johnson's home. Even though he exited on 27th Street, Johnson's house was

on a direct path to Williams' home. Mr. Williams parked his truck near the intersection of 27th and Bellefontaine, across the street from Johnson's home. When he attempted to exit the cab of the tractor, Mr. Williams fell, breaking his leg on impact. Although Williams could not recall the exact time of the accident, he estimated that the ambulance arrived about 30 minutes after it happened. The ambulance record shows that it arrived at 7:07.

Mr. Williams testified that he had gone to visit Johnson to tell him about the trailer that he had pulled into Kansas City, in hopes that Johnson would apply to Transpo for employment and be hired to complete the delivery for such trailer. Bill Sobotka testified concerning Transpo's normal procedure to secure substitute drivers. Mr. Sobotka testified that a computer was available to determine what regular Transpo drivers were in the area and that, if a load was in jeopardy due to a driver's inability to make a final delivery, a regular driver would be brought in by commercial air, if necessary, to take over the load. Mr. Sobotka and Sam Simonian had the exclusive authority and responsibility for making such arrangements. On the occasion in question, neither Simonian nor anyone else had authorized Williams to find a substitute driver.

Gerald Pennington was Transpo's vice president in charge of the eastern region. Mr. Pennington testified regarding a phone conversation which had taken place between himself and Williams. Mr. Pennington testified that, during the conversation, Williams admitted that he was not on duty when the accident occurred, and that he had not gone to Johnson's to secure a substitute driver, but rather to see a personal friend. At the time Pennington testified, he was no longer employed by Transpo and had secured a comparable position with another employer in the same field. This conversation took place several months after Williams had filed his worker's compensation claim. Mr. Williams denied having made such statements to Pennington.

The hearing before the administrative law judge (ALJ) resulted in a determination that Williams' injury did not arise out of and in the course of his employment with Transpo. The ALJ specifically determined that Williams was on a personal errand when he was injured and that compensation was thus prohibited. As a basis for this determination, the ALJ recited a myriad of pertinent facts, including: Transpo would not hire any substitute driver unless he or she met all requirements including a driving test administered by Transpo; Williams knew that Johnson had applied for employment with Transpo and had been refused; Transpo did not allow drivers to choose or select substitute drivers; Transpo did not give Williams permission to choose or select a substitute driver; Transpo did allow Williams to drive to his home from the terminal but in no way authorized him to use the truck for personal purposes or to visit friends; Williams knew that he would not be required to work on November 12, 1984; Williams' admitted purpose in deviating from his normal route home was to visit Johnson to see if he could get his old friend a job with Transpo so that Johnson could make some money. Finally, the ALJ specifically found the testimony of Gerald Pennington concerning Williams' admission that he was not on duty and was not seeking to find a substitute driver, but rather was visiting an old friend, to be credible.

From the denial of compensation, Williams brought an application for review before the Labor and Industrial Relations Commission. The commission found that the decision of the ALJ was supported by competent and substantial evidence and affirmed the decision in all respects. This appeal followed.

Missouri's Worker's Compensation Act applies only to accidental injuries arising out of and in the course of employment. *Stout v. Sterling Aluminum Products Com.*, 213 S.W.2d 244, 246 (Mo.App.1948). Missouri cases have thus long held that a claimant under the Worker's Compensation Act has the burden of establishing that he sustained an injury by accident arising out of and in the course of his employment. *See, e.g., Pulliam v. McDonnell Douglas Corp.*, 558 S.W.2d 693, 697 (Mo.App.1977).

■ It is the general rule that an injury arises out of and occurs in the course of employment when it occurs within the period of employment, at a place where the employee may reasonably be, and while such employee reasonably is fulfilling the duties of his employment or is engaged in doing something incidental thereto. *Barton v. Western Fireproofing Co.*, 326 S.W. 2d 344, 347–48 (Mo.App.1959). *See also Automobile Club Inter–Insurance Exchange v. Bevel*, 663 S.W.2d 242, 245 (Mo. banc 1984). For an injury to be compensable, the claimant must therefore show that he was either reasonably fulfilling the duties of his employment, or engaged in doing something incidental to such duties when injured. *Barton v. Western Fireproofing Co.*, *supra*, 326 S.W.2d at 347–48.

■ It is clear from the evidence presented at the hearing before the ALJ that Williams was neither carrying out duties of his employment nor engaged in an activity incidental to his employment. There are three requirements which must be met in order for an activity to be considered incidental to employment: first, it must occur within reasonable limits of time and place; second, it must be for the comfort or convenience of the employee; and third, it must benefit, at least indirectly, the employer. *Yaffe v. St. Louis Children's Hospital*, 648 S.W.2d 549, 551 (Mo. App.1982). *See also Jones v. Bendix Corp.*, 407 S.W.2d 650, 653 (Mo.App.1966); *Thompson v. Otis Elevator Co.*, 324 S.W. 2d 755, 758 (Mo.App.1959).

The cases uniformly indicate that activities which occur within a reasonable limit of time are those which take place during or immediately before or after the employee's working hours. *See, e.g., Jones, supra*, 407 S.W.2d at 650 (accident occurred at 6:45; employee's shift began at 7:00); *Yaffee, supra*, 648 S.W.2d at 549 (accident occurred while employee was working); *Goetz v. J.D. Carson Co.*, 357 Mo. 125, 206 S.W.2d 530 (Mo.1947) (accident occurred while employee was working); *Jackson v. Euclid–Pine Investment Co.*, 233 Mo.App. 805, 22 S.W.2d 849 (Mo.App.1930) (accident occurred while employee was working);

*Schultz v. Moerschel Products Co.*, 142 S.W.2d 106 (Mo.App.1940) (accident occurred while employee was working); *Culberson v. Daniel Hamm Drayage Co.*, 286 S.W.2d 813 (Mo.1956) (accident occurred while employee was on lunch break in the middle of her shift). In the present case, however, Williams testified that the accident which resulted in his injuries occurred hours after he left Transpo's terminal. During that period, Williams sat in the Metro Truck Stop and talked with some other truck drivers, drove around Kansas City, and eventually went to visit a friend. Therefore, Mr. Williams' activities which led to his injuries did not occur within a reasonable limit of time.

Nor was the act of stopping to visit Johnson undertaken for Mr. Williams' comfort or convenience. The only circumstances in which courts are willing to conclude that an activity is for the comfort or convenience of the employee involve fulfillment by the employee of a physical bodily need. *See, e.g., Jones, supra*, 407 S.W.2d at 653; *Schultz, supra*, 142 S.W.2d at 110. Thus, an employee is performing an activity for his comfort or convenience when he eats or drinks. *See Jones, supra*, 407 S.W.2d at 653; *Yaffee, supra*, 648 S.W.2d at 551; *Goetz, supra*, 206 S.W.2d at 534. An employee is engaged in an act for his comfort or convenience when using a toilet provided by his employer for his use, *see Shultz, supra*, 142 S.W.2d at 110, or when seeking warmth, *see Jackson, supra*, 22 S.W.2d at 852, or when sleeping. *See Culberson, supra, supra*, 286 S.W.2d at 817–18.

Mr. Williams' activities here, however, are not of this sort. He testified that, when he was injured, he was going to visit with Johnson about a job. Mr. Williams' activities were in no way aimed at the satisfaction of a physical bodily need and therefore cannot be said to have been for his comfort and convenience within the meaning attached to that phrase by established worker's compensation law.

Moreover, contrary to the Williams' assertions, his activities did not in any way benefit his employer. Admittedly, there was testimony that he was injured while

stopping at Johnson's home to discuss the possibility of Johnson's being hired as a substitute driver. However, Williams had neither the duty nor authority to arrange for substitute drivers for Transpo. Sobotka and Simonian had the exclusive authority and responsibility for making such arrangements. A computer was available to determine what Transpo drivers were in the area. Neither Simonian nor anyone else at Transpo authorized Williams to find a substitute driver to take over Mr. Williams' load.

This result is not changed by Williams' lease agreement with Tiger Resources, Inc. Although the terms of that lease gave Williams the authority to hire another driver to drive the tractor which was leased to him after obtaining Tiger Resources' "written consent", Williams had not obtained Tiger Resources' written consent as the lease required. Therefore he was without authority to hire a substitute driver to haul the load. Additionally, Williams had previously been told by Transpo's representatives that the matter would be handled by them. Given these facts, it was certainly reasonable for the ALJ to conclude that Williams' injuries were not sustained during activities which were incidental to Williams' employment. Mr. Williams had no authority under the lease or otherwise to arrange for Transpo's substitute drivers. Therefore, no purpose of Transpo's was or could have been served by Williams' visiting Willie Johnson to try to procure a substitute driver.

Mr. Williams had the burden to show that his injuries arose in the course of his employment or was engaged in activities incidental thereto. Based on the evidence presented at the hearing below, Williams failed to meet his burden.

Williams further argues that the commission's finding that his injuries did not occur in the course or scope of this employment ignores the applicability of the "dual purpose" doctrine. It is Williams' contention that the operation of this doctrine entitles him to an award of compensation. The point is without merit.

Neither the "dual purpose" doctrine nor the doctrine established by *Reneau v. Bales Electric Co.*, 303 S.W.2d 75 (Mo.1957), is a separate theory of compensability under the Worker's Compensation Act; rather, these doctrines are simply exceptions to the general rule that injuries sustained while an employee is traveling to or from work do not arise in the course of his or her employment. *See Garrett v. Industrial Commission*, 600 S.W.2d 516 (Mo.App.1980); *Cox v. Copeland Brothers Construction Co.*, 589 S.W.2d 55, 56–57 (Mo.App.1979). Under the "dual purpose" doctrine, injuries sustained by an employee during a trip to or from work are compensable where the primary purpose of the trip was in furtherance of the employer's business even though at the same time the employee was serving some purpose of his or her own. *See Cox v. Copeland Brothers Construction Co., supra*, 589 S.W.2d at 57. Under the *Reneau* doctrine, an exception to the general rule arises where the employer furnishes the employee's transportation, compensates the employee for use of his or her own vehicle, or pays the employee for travel time. *See Reneau v. Bales Electric Co., supra*, 303 S.W.2d at 79; *Garrett v. Industrial Commission, supra*, 600 S.W.2d at 519. In those situations, "because a specific nexus is established between the work to be done and the physical movement of the employee from point to point, any injury the employee suffers by accident while traveling arises out of and in the course of the employment...." *Garrett v. Industrial Commission, supra*, 600 S.W.2d at 519 (citing *Reneau v. Bales Electric Co., supra*, 303 S.W.2d 75). It is clear that Missouri courts regard both of these doctrines as mere exceptions to a general rule of compensability, and not as separate theories of compensability in and of themselves.

Neither the "dual purpose" doctrine nor the *Reneau* doctrine applies here, because the general rule to which they are exceptions is not implicated here. Mr. Williams was injured as he was leaving the cab of his truck which was parked at Johnson's home. Mr. Williams was injured, not en route from his work to his home, but while

en route to or after arriving at a friend's house. Though the road past Johnson's home may be one way to reach Williams' home, such a fact is irrelevant because Williams testified that, when he was injured, he was not going home but was going to visit Willie Johnson. It seems obvious that, where the employee's destination is ascertainable, it should be controlling.

The judgment is affirmed.

All concur.