Debbie BRENNEISEN, Nicholas Brenneisen, a minor, and Amanda Brenneisen, a minor, Appellants,

v.

LEACH'S STANDARD SERVICE STATION, Respondents.

No. 58249.

Missouri Court of Appeals, Eastern District, Division Two.

Feb. 5, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 13, 1991.

Application to Transfer Denied May 3, 1991.

John C. Weller, St. Louis, for appellants.

C. Lawrence Mueller, St. Louis, for respondents.

PUDLOWSKI, Judge.

This appeal of a worker's compensation claim comes to this writer on reassignment. We reverse and remand in accordance with this opinion.

Claimants assert the Commission erred as a matter of law in finding that decedent's fatal injury did not arise out of and in the course of employment. Claimants further assert the Commission's order is based upon a clearly erroneous finding of fact that no employee ever went home to retrieve soiled uniforms during working hours.

Decedent worked as a mechanic at employer's service station. He worked the evening shift, from 2 p.m. to 10 p.m. and frequently worked overtime. Employees at this service station wore a uniform consisting of pants and a shirt displaying the employee's name and the word "Certicare." The uniforms were supplied by Unitog Company, and that organization cleaned and maintained the uniforms. Approxi-

mately ten dollars per week was deducted from each employee's wages to pay for the cost of cleaning the uniforms, whether the employee actually had the uniforms cleaned or not.

An established system existed to facilitate cleaning the uniforms. On Friday mornings, the Unitog representative would pick up the soiled uniforms and leave a clean supply for each employee for the following week. If an employee failed to leave his soiled uniforms at the station for the Friday pickup, that employee would have clean uniforms for the following week, but not the week thereafter.

On the day of the accident, a Thursday, decedent drove his personal vehicle to work. His wife called him during his shift to inform him that he had forgotten to take his soiled uniforms with him to the station. Decedent told his wife he would retrieve them after work. After decedent clocked out, at 10:37 p.m., he rode home on a fellow employee's motorcycle, retrieved his uniforms and was returning to the place of employment. On the return trip he collided with a parked car, which resulted in his death.

■ The fundamental purpose of the Worker's Compensation Law is to place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment. The law is to be broadly and liberally interpreted and is intended to extend its benefits to the largest possible class. Any question as to the right of an employee to compensation must be resolved in favor of the injured employee. *Wolfgeher v. Wagner Cartage Service, Inc.*, 646 S.W.2d 781, 783 (Mo. banc 1983).

In *Wamhoff v. Wagner Electric Corporation*, 190 S.W.2d 915, 917 (Mo. banc 1945) the Supreme Court said:

> The courts of this and other states have often found it necessary to construe the phrase 'arising out of and in the course of employment,' but no all-embracing definition has yet been framed. [E]very case involving this phrase should be decided upon its own particular facts

and circumstances and not by reference to some formula.

> .    .    .    .    .

> Each case [must] turn upon the point of whether, under its particular circumstances, the injury arose from something which had become an *incident* to the employment. (Emphasis added).

The doctrines which the claimants relied upon are the "dual purpose" and "mutual benefit" rules. These two rules are often used interchangeably. *McClain v. Welsh Co.*, 748 S.W.2d 720 (Mo.App.1988). The guiding principles for this court to review the Industrial Commission's decision are elaborately set out in *McClain*, 748 S.W.2d 720 at 724, and therefore need not be repeated here.

The dissenting opinion would affirm the commission's award because the claimants failed to show that the injury did "arise out of the deceased's employment." The opinion stresses that the death did not result from a risk of his employment and relies on *Beck v. Edison Bros. Stores, Inc.*, 657 S.W.2d 326, 328 (Mo.App.1983) where it elucidates that the employee is subject to the same hazards to which the general public is exposed and he was not, by reason of his employment, exposed to a greater danger than the public at large. The facts of this case belie that principle.

A review of the transcript reveals that the hearing administrative law judge became ill and was unable to make the award. The parties agreed that another administrative law judge could, upon review of the transcript and legal file, render an award. He did so. The Labor and Industrial Commission affirmed the administrative judge's award by a 2–1 opinion. The majority opinion incorporated and made as part of its decision the opinion of the non-hearing administrative law judge's opinion.

The majority opinion in pertinent part held:

> The accident occurred at a place which was on a normal route between the place of employment and the employee's home. The place of accident was at a location where the employer might reasonably expect the employee to be when going to or

coming from work. A question of deviation from a normal route has no bearing in this matter.

The opinion continues:

Mr. Leach, the employer, testified that charges for the uniforms were deducted from the employee's wages and that the uniform company would collect the uniforms on Friday mornings. He encouraged the use of uniforms but the question of whether or not uniforms were mandatory was never discussed. No individual was terminated for failure to wear a uniform; *No one ever went to obtain a uniform to wear or retrieve soiled uniforms during working hours* and the only objections the employer made regarding dress was related to wearing a T-shirt while at work. *The fact that employees wore uniforms and appeared equal was, in the employer's opinion, an asset to the business.* The indication by the employer that the uniform company would stop the following Monday for those who forgot to return the soiled uniforms on Friday is only reflected by the employer. Fellow employees did not testify as to this procedure. (Emphasis added).

The findings of the commission do not comport with the testimony of the owner of the service station. The deposition testimony of Bob J. Leach reveals:

Q. [by Mr. Weller, Atty. for Claimant] What would happen if an employee says, 'Bob, I don't want any money taken out of my check for uniforms?'

A. [Mr. Leach] Well, at that point, you know, it has to either come up to whether they're a good enough employee to keep them, or they need to wear uniforms. That's why I went to furnishing uniforms myself.

Q. Okay. So it was your desire then and your policy that your employees wear uniforms. Is that right?

A. Yes.

Q. Okay. And it was your preference then that the employees wear the uniforms that you had arranged for them from Unitog Company. Is that right?

A. Yes.

Q. Okay. Were your employees ever given the option of arranging uniforms at any other company or from any other source?

A. The question never came up.

Q. Okay. So, if an employee came, came to work and did the work that was asked of him but just refused to wear the uniform that was provided to him, he would not be fired or told to wear a uniform?

Mr. Mueller: I would object to this question because it's previously been answered, but you can answer it again. Go ahead.

A. I don't like the opinion of a man wearing a T-shirt on the driveway to the public, and I will not allow that, but they can go get a shirt if they go borrow shirts from other men. They can do whatever, but I do not allow a t-shirt on the driveway.

Q. (By Mr. Weller) All right. You stated earlier, I believe, that it's your preference [sic] that a uniform be worn. Is that right?

A. That's the image.

Q. Okay. And what benefit is that to you as an operator of this company that you've operated since 1978 at this location? What benefit derives for you in seeing your employees in their uniform?

A. I know you only want the questions answered, but a uniform is to benefit the employee, too. It's to protect their regular clothes, and all the men like uniforms.

Q. Right, and I understand that. But what benefit comes to you from you seeing your employees in these uniforms?

A. All my men look equal.

Q. And what is that? Why is that?

A. In uniform.

Q. Okay. And what does that do for you?

A. It sets an image for your place of business.

Q. And that image is good one you feel?

A. I feel it's a good image, and that's the image that *they have to accept if*

*they work there.* They want to look good, too. (Emphasis added).

Q. Okay. In that same regard now, to your knowledge, or from any other source, what you heard, had any other employees ever made a trip at the end of their shift to go home or go anywhere else and get uniforms and bring them back to the station?

A. No.

Q. Now, I'm trying to be—I'm not trying to be particular with my answer, but I'm going to broaden the question out a little bit further. Not only at the end of their shift, but at the beginning of their shift or during their shift or during their lunch break, I'm talking about at any time, had you ever known an employee to go, for the purpose of leaving your station, going somewhere, getting uniorms [sic] and bringing them back to the station so that the dirty uniforms could be turned in?

A. Okay. Then if you're going to put it that way, possibly. I've let them go while they're on the clock to get their uniforms. They wasn't forced to, but I forget mine.

A. Well, even if they're working and they say, "I forgot my uniform. The uniform man's coming in an hour. Can I go get my uniforms," and if they live close, I've forgotten mine and I went and got them. I'm being honest now.

Q. And I appreciate that.

A. I forgot mine and had to go get them.

Q. But you have had an employee come to you and say, "I'd like to go home and get my uniforms and bring them back," and you've let them go. Is that right?

A. Yes.

Q. Okay. Now, have you—Do you recall by any chance who that employee might have been or—

A. No.

Q. Do you have any idea on how many occasions that might have occurred in the last seven years or so when you've operated that station?

A. Two or three times, and probably me.

A fair reading of the testimony of the owner of the service station reveals, first, that if an employee did not want money taken out of his pay check for the uniforms and was not considered a good employee, he possibly would be terminated. Second, the wearing of the uniform was mandatory. Third, the wearing of the uniform was a benefit to both the employer and the employee. Finally, and most importantly, the employer allowed other employees to leave work during regular working hours to return home to retrieve their dirty uniforms to be picked up by the cleaning service. In fact, the owner, as a fellow employee, frequently followed this practice.

■ The fact of the matter is that the commission which incorporated the administrative law judge's award as its award overlooked the undisputed and crucial fact that other employees, including the owner, traveled to their homes to recover their uniforms. This serious oversight combined with the unquestioned fact that the wearing of the uniform was a benefit to the employer, are more than sufficient to fall within the "mutual Benefit" doctrine.

This court held in *Shannon v. St. Louis Board of Education,* 577 S.W.2d 949 (Mo. App.1979) that an employee who slips and falls on a university campus while on his way to the cafeteria to buy a sandwich is compensable under the mutual benefit doctrine. The employee attended the university to obtain his Ph.D. degree. The evidence revealed that the employer benefitted because the reception of the Ph.D. by the employee helped maintain its quality faculty even though the benefit to the employee in obtaining the degree was obviously greater to the employee than it was to the employer.

■ This principle enunciated in Wamhoff is known as the "Mutual Benefit Doctrine" and although the "dual purpose" doctrine is often used interchangeably, *McClain,* 748 S.W.2d 720 at 726, there is a slight distinction. The dual purpose doctrine is normally applied only to a situation involving travel, whereas the mutual benefit doctrine is not so restricted. The doc-

trine simply states that an injury suffered by an employee while performing an act for the mutual benefit of the employer and the employee, is compensable when some advantage to the employer results from the employee's conduct. Again, this doctrine, like the dual purpose doctrine, applies even though the advantage is slight. *J. Kenter,* Missouri Workers Compensation, Section 5:3 (1989).

The claimants relied on the mutual benefit doctrine and claimed that the Industrial Commission erroneously declared the law by stating that the decedent was not performing an act which was for the benefit of the employer.

The dissenting opinion seems to place emphasis upon the failure of claimants to show the second prong of their claim in that the accident did arise out of the employment and that the injury was not the result of a risk peculiar to the employment.

■ The general principle is that injuries sustained by an employee while in route from his home to his place of employment are not sustained "within the course and scope" of his employment and are, therefore, not compensable. Certain exceptions to this general rule have been clearly defined by the courts of this state. As previously mentioned one of those exceptions is called the "dual purpose doctrine." In *Cox v. Copeland Bros. Const. Co.,* 589 S.W.2d 55, 57 (Mo.App.1979) the court said:

This doctrine in Missouri finds its basic support in the case of *Marks' Dependents v. Gray,* 251 N.Y. 90, 167 N.E. 181 (Ct. of App.1929), in which Cardozo, C.J., held that street risks to which an employee was necessarily exposed while traveling to and from work, unrelated to the service of the employer, did not fall within the ambit of compensable consequences. The court in Marks declared that the determination of whether an injury incurred from such a risk was compensable from the employer hinged upon a simple factual basis, I.e. 183[2]:

'The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own.'

The rationale of *Marks* and the cases which follow it, is that if the exposure to the perils of the highway is related to the employment even though the employment is not the sole cause of such exposure to such risks but is combined with or is a concurrent personal cause, the benefit of compensation is not to be withdrawn.

The evidence in this case clearly shows that the deceased was traveling as a necessity of the employer and as a consequence the risk involved arose out of his employment and his death is compensable. The dissenting opinion relies on *Beck v. Edison Bros. Stores, Inc. Beck* was a common law cause of action alleging common law negligence. Our court held that the plaintiff-employee traversing a sidewalk that was open and available to the general public was subject to the same hazards to which the general public was exposed and was *not,* by reason of her employment, exposed to a greater danger than the public at large. The reliance on *Beck* is misplaced. The claimant in that case was not in the employment of her employer when the injury occurred.

■ We address the claimants' second point of error. Claimants allege that the commission in declaring that the deceased abandoned his employment by driving the motorcycle at a speed far in excess of the speed limit erred because there is no substantial and competent evidence in the record to support such a finding of fact. The evidence from the transcript shows that Officer Redeker testified from a diagram prepared by Sgt. Zieber. Neither officer was present at the time of the collision. The pertinent part of Redeker's testimony was in response to a question from the employer's attorney as to the speed of the motorcycle at the time of the collision. He answered "It could have easily have been sixty-five. If I had to *guess,* I would say seventy or eighty miles per hour. That is all I can tell you." (Emphasis added).

Section 287.120 provides "that every employer subject to the provisions of this

chapter shall be liable, *irrespective* of negligence, to furnish compensation under the provision of this chapter for personal injury or death of the employee by accident arising out of and in the course of his employment, and shall be released from all other liability therefrom whatsoever...." (Emphasis added).

As this opinion aforementioned stated, this accident arose out of and in the course of the deceased employment and his death is compensable. Negligence has no part in this claim. Other jurisdictions may provide a rejection of a claim because of "willful" or "serious" misconduct. This jurisdiction does not.

The judgment of the Industrial Commission award is reversed. Further, the Industrial Commission should enter an award for the claimants' claim and we would remand to the Industrial Commission to determine the amount of compensation to the claimants in accordance with the Workers' Compensation Act.

GARY M. GAERTNER, P.J., concurs in result.

CRIST, J., dissents in separate opinion.

CRIST, Judge, dissenting.

I dissent. The mutual benefits doctrine requires that the injury arise both "out of," and "in the course of," the employment. *Davison v. Florsheim Co.*, 750 S.W.2d 481, 483[2, 3] (Mo.App.1988); *Yaffe v. St. Louis Children's Hosp.*, 648 S.W.2d 549, 550 (Mo. App.1982). This injury did not arise "out of" the employment. An injury arises out of the employment when there is "a causal connection between the nature of the employee's duties or conditions under which he is required to perform them and the resulting injury." *Davison*, 750 S.W.2d at 483[4]. Further, the injury must result from a risk reasonably inherent in the particular conditions of employment. *Yaffe*, 648 S.W.2d at 551. While on his motorcycle, decedent was not exposed to a greater danger than the public at large by reason of his employment.

The majority attempts to distinguish this case from that of *Beck v. Edison Bros. Stores, Inc.*, 657 S.W.2d 326 (Mo.App.1983). The majority argues the cases are distinguishable because in *Beck*, the claimant was not in the employment of her employer at the time of her injury. Whether or not the claimant was in the employment of her employer is exactly the issue in both cases. The general rule on going to and coming from work, as enunciated in *Beck* and numerous other cases, is that injuries sustained by an employee while going to or from work are not generally held to arise out of and in the course of employment. *Id.* at 328[1]. An exception to this rule exists where the off-premises point is on the only route or the normal route that employees must take to get to their employment and *there exists a special hazard, one to which the employee is exposed by reason of the employment, to which the general public is not subjected. Id.* (Emphasis added.) In *Beck*, the court found that because claimant was subject to the same hazards to which the general public was exposed (she slipped on snow on the sidewalk while walking towards employer's front door), she was not by reason of her employment exposed to a greater danger than the public at large. The same reasoning holds true in this case. Running into a parked car while riding a motorcycle is a risk to which the general public is subjected. This risk was not increased in any way by the nature of decedent's employment.

The Commission's order was supported by competent and substantial evidence on the whole record. The majority opinion has erroneously applied the law.