Lari Ann EVANS, Appellant,

v.

CONSUMER PROGRAMS, INC., and American Motorist Insurance Company, Respondents.

No. 18369.

Missouri Court of Appeals, Southern District, Division One.

Feb. 10, 1993.

Motion for Rehearing and Transfer to Supreme Court Denied March 4, 1993.

Application to Transfer Denied April 20, 1993.

Robert W. Hill, Springfield, for appellant.

Raymond E. Whiteaker, Janis L. Prewitt, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for respondents.

CROW, Presiding Judge.

On May 7, 1990, two employees of Consumer Programs, Inc. ("CPI"), Lari Ann Evans ("Claimant") and her husband, Timothy A.W. Evans, were traveling in an automobile. An accident occurred. Mr. Evans was killed. Claimant was injured.

Claimant filed two claims against CPI under The Workers' Compensation Law, chapter 287, RSMo 1986, as amended. In one (number 90–161447), Claimant sought benefits for her injuries. In the other (number 90–161440), Claimant sought benefits for her husband's death. § 287.240, RSMo Cum.Supp.1990.

An administrative law judge ("ALJ") of the Division of Workers' Compensation entered an award denying each claim. On application by Claimant for review, the Labor and Industrial Relations Commission ("Commission") entered an award affirming the ALJ's denial.

Claimant appeals. The sole issue is whether the Commission erred in holding the tragic occurrence was not an "accident arising out of and in the course of" the Evanses' employment.

Appellate review of a final decision by the Commission in a workers' compensation case is governed by Mo. Const. art. V, § 18 (1945, amended 1976), and § 287.495, RSMo 1986.[1] From those

---

1. Section 287.495 reads, in pertinent part:

1. ... Upon appeal no additional evidence shall be heard and, in the absence of fraud,

sources, additional principles have evolved. *Rector v. City of Springfield*, 820 S.W.2d 639, 640 (Mo.App.1991); *Causey v. McCord*, 774 S.W.2d 898, 899 (Mo.App. 1989). In reviewing questions of fact, an appellate court's inquiry is limited to whether, upon the whole record and considering the evidence in the light most favorable to the Commission's findings, the Commission could have reasonably made such findings and reached the result it did. *Lawson v. Emerson Electric Co.*, 833 S.W.2d 467, 471 (Mo.App.1992); *Swillum v. Empire Gas Transport, Inc.*, 698 S.W.2d 921, 925[3] (Mo.App.1985). The appellate court disregards evidence which might support a finding different from that of the Commission, even though a contrary finding would be supported by the evidence. *Rector*, 820 S.W.2d at 640[3]; *Phillips v. Ozark Bank*, 803 S.W.2d 662, 663 (Mo.App. 1991).

So viewed, the evidence demonstrates Claimant and her husband ("Tim")[2] were employed by CPI as photographers. Their "permanent home" was in the "Springfield, Missouri area," but their job assignments took them into several states. Claimant and Tim would each be assigned a store at which each would take photographs. Describing their duties, Claimant testified:

> Setting up equipment, keeping the equipment in working order, supplies, taking pictures of our customers, good customer rapport, giving them an appointment when to come back, presell to them, tell them they're going to have a lot of extra nice pictures that they can purchase at an additional cost.

Claimant's testimony was unclear as to how long she or Tim would remain at a job site; however, we infer neither was ever at one site more than six days. Evidently, their practice was to disassemble the equip-

ment at each site on Sunday night in preparation for travel. Claimant's testimony:

> Q How were your job assignments given to you ... by CPI?
>
> A Over the telephone on a weekly basis on Sunday night when I would call into my district manager, how many customers I did, subjects, how much money I collected.

Because they worked at different sites, Claimant and Tim traveled separately. However, they frequently had assignments in the same area. Claimant explained:

> Our district managers were real helpful in keeping ... our towns close enough together that we could drive and spend the night together.
>
> Q Is this something that was an accommodation before your work trip began?
>
> A Yes. We would talk about ... our schedules ... in advance so I'd know ... where I was going, how much money I should take with me, where ... we would expect to stay. ... for instance, when I ... shot La Junta, Colorado, Tim was in Pueblo, we stayed in the middle, in a town in between, because the distance was 20 miles apiece and it was worth it for us to be able to stay together; or when we worked in the Denver area and Tim might be doing Thorton (sic) and I might be doing something south, we would stay in town, right there.

CPI paid Claimant and Tim mileage from their home to the job sites and back. When Claimant or Tim went from one job site to another before returning home, CPI paid them mileage from site to site. CPI also paid them an hourly rate for driving time, calculated at 55 miles per hour. Mileage driven by Claimant and Tim to an intermediate location between their respective job

---

the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

  ....

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

  ....

**2.** In her testimony, Claimant referred to her late husband as Tim. For convenience, so shall we.

sites to be together overnight was uncompensated by CPI.

For each day away from home, CPI paid Claimant and Tim "per diem" of $35 each. Per diem stopped the day they arrived home. When the time interval between jobs was short and one job site was near the next, but far from their home, it was less expensive for CPI to pay Claimant and Tim per diem to stay in the job area than to pay them to drive home from the first site and back to the next. Claimant testified that in such circumstances CPI encouraged her and Tim not to go home between jobs. According to Claimant, this was a "custom." She added that on such occasions their managers suggested she and Tim use the spare time for sight-seeing and recreation. Claimant's testimony:

.... when we did our Sunday call-ins is when we would get the suggestions of things to do, things to see and places to go. Sunday nights we did our call-ins and that's when they'd make little suggestions, because we would have Monday and Tuesday off except we'd be at our next promotion Tuesday evenings setting up.

....

Q ... what benefit was derived by your employer, CPI, when Tim and yourself would stay out on these work trips as opposed to driving home to Springfield, Missouri?

....

A ... The benefit to CPI is that I, as an employee, am much happier because I didn't spend my day off rushing through a state to get home. I spent ... this lack time sightseeing, seeing something that the country had to offer. I was rested and in a better frame of mind, and the company didn't have to pay my mileage to go home or my hours to go home. I felt like it was beneficial to everyone.

On Sunday night, May 6, 1990, Claimant finished a job at Scottsbluff, Nebraska; Tim finished one in Denver, Colorado. He drove to Scottsbluff that night, joining Claimant around 10:30.

Claimant's next assignment was La Junta, Colorado; Tim's was Pueblo, Colorado.

They were to be at those respective sites before 8:00 p.m., Tuesday, May 8. Therefore, explained Claimant, they had all day Monday and a few hours Tuesday to themselves. They decided to go to Mt. Rushmore, South Dakota, some 200 miles north of Scottsbluff.

Claimant and Tim departed Scottsbluff by automobile Monday morning, May 7, 1990, around 8:30 or 9:00, northbound toward Rapid City, South Dakota. The accident described at the outset of this opinion occurred before they reached their destination. Although the accident location is unrevealed by the record, we infer it was somewhere in South Dakota. Claimant testified she was taken from the accident scene to a hospital in Hot Springs, South Dakota, then transferred to a hospital in Rapid City, South Dakota.

The ALJ found that because the next job assignments of Claimant and Tim were in southern Colorado, their journey north to Mt. Rushmore was not "work-related." Instead, it was "a deviation for personal benefit" from their job travel. The ALJ continued:

One exception to the deviation rule is the mutual benefit rule. The mutual benefit rule generally involves a single act performed for the benefit of both the employee and the employer. [Claimant] testified that the reason for their visit to Mt. Rushmore was to take pictures and to enjoy the scenery. This is a personal benefit. [Claimant] also testified that their employer encouraged them to see the tourist attractions when they were on the road. It was indicated that because of the employer's insistence that they see the tourist attractions that the personal travel becomes a benefit to the employer. The only argument that could be made in this regard is that the employee becomes a happy employee because he has experienced an enjoyable situation, to-wit: viewing of the scenery and visiting Mt. Rushmore, and because the employee is a happy employee, the employer benefits because a happy employee is a good employee. Workers' compensation does not provide benefits to employees for 24

hours a day, seven days a week and 52 weeks a year. The argument fails.

In its award, the Commission incorporated the ALJ's findings and, as reported earlier, denied benefits.

■ The first of Claimant's two points relied on avers the Commission erred in that the evidence "established that the accident did arise out of and in the course of employment as the employees were engaged in an act for the mutual benefit of the employer and the employees." Claimant cites three cases in support of this contention.

The first is *Wamhoff v. Wagner Electric Corp.*, 354 Mo. 711, 190 S.W.2d 915 (banc 1945). There, an employer allowed its employees to keep busy on personal work when not performing company work. An employee, while "plating" a company product in a chemical tank, placed a personal article in the tank to "[use] up the amperage," a common practice. The employee removed both articles from the tank, polished the company product, then began polishing his personal article. While doing so, one of his hands was caught in the machine and injured. The Commission awarded workers' compensation benefits. On appeal by the employer, the Supreme Court of Missouri noted the employer expected to derive benefit when employees worked on personal items, as the employees would learn new methods and improve the quality of their work. 190 S.W.2d at 919. The Supreme Court held:

> An injury suffered by an employee while performing an act for the mutual benefit of the employer and the employee is usually compensable, for when some advantage to the employer results from the employee's conduct, his act cannot be regarded as purely personal and wholly unrelated to the employment. Accordingly an injury resulting from such an act arises out of and in the course of the employment; and this rule is applicable even though the advantage to the employer is slight.

190 S.W.2d at 919[9].

The second case cited by Claimant is *Blatter v. Mo. Dept. of Social Services*, 655 S.W.2d 819 (Mo.App.1983). There, an employer scheduled a mandatory two-day training session for its employees at a motel. During the first day, a supervisor announced he and other participants planned to meet that evening at a tavern across the street for cocktails, and anyone who wished to join them was welcome. At the appointed time, a dozen or so employees went to the tavern "as a group." Later, one of them was struck by an automobile and killed as he crossed the street returning to the motel. There was evidence that during the gathering at the tavern, the victim discussed his work load with a supervisor. The Commission found informal meetings by employees of that employer provided a forum where problems could be discussed, and had by custom become an incident of employment. Consequently, the Commission held the fatality arose out of and in the course of employment. On appeal by the employer, this Court held the record supported the Commission's finding that some benefit, admittedly slight, was derived by the employer from the informal discussions at the tavern. *Id.* at 826. Recognizing the case was very close, this Court held there was sufficient competent evidence to warrant the award of workers' compensation benefits. *Id.*

The third case on which Claimant relies to support her first point is *Brenneisen v. Leach's Standard Service Station*, 806 S.W.2d 443 (Mo.App.1991). There, employees of a service station wore uniforms, supplied and cleaned by a uniform company. A deduction was made from each employee's wages for the cleaning cost. Each Friday morning the uniform company picked up soiled uniforms at the station and left clean ones. One Thursday night, an employee went to work without taking his soiled uniforms. After completing his shift, he rode home on another employee's motorcycle, retrieved the uniforms, and was returning to the station when he struck an automobile. The Commission held the accident did not arise out of and in the course of employment. The Eastern District of this Court held otherwise. The court noted wearing of the uniforms was

mandatory and the employer allowed employees to leave during regular working hours to retrieve soiled uniforms for cleaning. These facts, said the Eastern District, combined with the fact that uniform-clad employees were a benefit to the employer, brought the case within the mutual benefit doctrine. *Id.* at 447.

The instant case differs from each of the three on which Claimant relies.

Unlike *Wamhoff,* there is no evidence Claimant or Tim was learning new photography methods or enhancing job skills on the Mt. Rushmore trip.

Unlike *Blatter,* Claimant and Tim were unaccompanied by superiors on the Mt. Rushmore trip and there is no evidence they discussed work-related subjects.

Unlike *Brenneisen,* Claimant and Tim were not en route to their work site, and were not on a journey to retrieve any job-related item.

Claimant argues CPI received a financial benefit when its employees "[stayed] out on a given work trip while between photography destinations as opposed to traveling home." The argument is undeniably supported by the record. But does that bring the Mt. Rushmore trip within the mutual benefit doctrine?

We hold it does not. While it was to CPI's financial advantage for Claimant and Tim to remain in the general vicinity of their next job assignments instead of driving home, CPI obviously realized no financial benefit from the Mt. Rushmore trip. CPI's per diem expense for Claimant and Tim remained the same, regardless of what they did on their non-working days away from home. The Mt. Rushmore trip cost CPI nothing and saved it nothing.

Arguably, the May 8, 1990, job assignments made it impossible for Claimant and Tim to return home after completing their work on May 6, thereby forcing them to remain in the vicinity of the May 8 job sites. One could therefore logically conclude CPI, in effect, required Claimant and Tim to stay near Colorado.

█ Although not cited by the parties, there are workers' compensation cases holding that where employees are sent away from home for job purposes, they are not expected to wait immobile during non-working hours, but may indulge in any reasonable activity in the locale. The determination whether a particular activity is reasonable is one of fact. *See: Robards v. New York Division Electric Products, Inc.,* 33 A.D.2d 1067, 307 N.Y.S.2d 599 (1970); *C. & E. Trucking Corp. v. Stahl,* 135 Ind.App. 600, 181 N.E.2d 21 (1962); *Matter of Compensation of Slaughter,* 60 Or.App. 610, 654 P.2d 1123 (1982). Generally, those cases hold it is reasonable to obtain lodging and food in the vicinity of the work site, hence injuries sustained while doing so are compensable. However, an employee is not within the course of his employment while engaged in a personal activity that is a distinct departure on a personal errand. *Slaughter,* 654 P.2d at 1126[2]. As explained in 1 Arthur Larson, *The Law of Workmen's Compensation,* § 19.31 (Bender 1992):

> When an employee deviates from his business route by taking a side-trip that is clearly identifiable as such, he is unquestionably beyond the course of his employment while going away from the business route and toward the personal objective....

Here, Claimant asserts in her reply brief, "[T]he issue is not whether a 'deviation' occurred, but whether the activity of sightseeing which was known of and encouraged by [CPI], was in fact mutually beneficial to [CPI] under the evidence of record."

We have already rejected Claimant's argument that the Mt. Rushmore trip was financially beneficial to CPI. Claimant's only other argument that CPI benefitted from the Mt. Rushmore trip is her contention that such excursions left her physically rested and mentally refreshed, thereby enhancing her job performance.

While that is a plausible argument, the same could be said of employees who find recreation in sky diving, bungee jumping, parasailing, mountain climbing, or hang gliding on their days off. We find no workers' compensation case where injuries from such activities on non-working days have been held compensable under the mutual benefit doctrine. In the cases cited by Claimant where the mutual benefit doctrine

was applied, the employer's benefit was more tangible than merely having a contented employee who returns to work after an enjoyable day off.

Viewed favorably to the Commission's award, the evidence does not compel a factual finding that CPI was benefitted by the Mt. Rushmore trip. Claimant's first point is denied.

■ Her second point avers the Mt. Rushmore trip was within the course of employment in that she and Tim were "engaged in activities anticipated by the employer, and which by custom had become incident to their employment."

In support of this point, Claimant cites two cases in which workers' compensation benefits were allowed and one where they were denied. In both cases where the employee was compensated, he was injured on his employer's premises. In one of those cases the injury occurred during the employee's lunch period and resulted from a game of indoor baseball which had, over some four to five years, become a settled practice known to the employer. *Conklin v. Kansas City Public Service Co.*, 226 Mo.App. 309, 41 S.W.2d 608 (1931). In the other case where the employee was successful, he arrived at work and parked his automobile on a parking lot maintained by his employer. Aware one of his tires had low air pressure, he obtained permission from a foreman to take a company air tank to the lot to inflate the tire during working hours. The employee slipped on ice in the lot and fell, injuring himself. *Bybee v. Ozark Airlines*, 706 S.W.2d 570 (Mo.App. 1986).

*Conklin* and *Bybee* are obviously unlike the instant case where the accident occurred on a non-working day while Claimant and Tim were away from their job sites, on their own time, and engaged in a journey over which CPI exercised no control.

In the third case cited by Claimant, *Finley v. St. Louis Smelting & Refining Co.*, 361 Mo. 142, 233 S.W.2d 725 (banc 1950), an employee, after completing his shift, went to his automobile on the company parking lot. Discovering its fan was stuck, he raised the hood and gave the fan a whirl with his hand. The fan started, severing one finger and part of another from his hand. The Supreme Court of Missouri held there was no causal connection between the injury and the employment. 233 S.W.2d at 728[5]. Compensation was denied. We fail to see how *Finley* supports Claimant's argument that the Mt. Rushmore trip was an incident of her and Tim's employment.

In her reply brief Claimant cites an additional case, which we have studied. It is too factually different from the instant case to warrant discussion.

We reject Claimant's contention that the evidence established the Mt. Rushmore trip was an incident of her and Tim's employment, thereby entitling her to workers' compensation benefits for her injuries and his death. Claimant's second point is denied.

Although the accident was a dreadful calamity, neither of Claimant's points relied on supplies any basis for overturning the Commission's denial of benefits. The Commission's award in claims number 90–161447 and 90–161440 is affirmed.

PARRISH, C.J., and SHRUM, J., concur.