Michelle **HILTON**, Appellant,

v.

**PIZZA HUT**, Respondent.

No. WD 49415.

Missouri Court of Appeals,
Western District.

Nov. 15, 1994.

Randall William Cain, Lee's Summit, for appellant.

Roland P. Walker, Columbia, for respondent.

Before FENNER, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

FENNER, Chief Judge.

Appellant, Michelle Hilton, appeals the final award of the Labor and Industrial Relations Commission (the Commission) denying compensation for injuries she sustained in an automobile accident. The Commission found that the decision of the administrative law judge (ALJ) awarding no compensation was supported by competent and substantial evidence and was in accordance with the Missouri Workers' Compensation Act. The decisive issue in this appeal is whether Michelle's injuries arose out of and in the course of her employment with respondent, Pizza Hut.

The record reflects that Michelle, who testified at trial on April 21, 1993, graduated from high school in 1989 and moved to Columbia, Missouri in May of 1990 to be with her boyfriend, Craig McCracken. Michelle took a job at Dairy Queen in Columbia and started working there on May 14, 1990. Craig was working at Pizza Hut at that time which was across the street from the Dairy Queen where Michelle worked.

On the afternoon of May 14, 1990, after Michelle got off work at Dairy Queen, she went across the street to Pizza Hut to meet Craig. Craig told Michelle that Nicole Sanders, store manager at Pizza Hut, wanted to talk to her about a waitressing job at Pizza Hut. After a short interview, Michelle was hired to work nights at Pizza Hut. Michelle filled out an employment application that day.

Michelle also filled out an Employment Eligibility Verification (Form I–9) that was dated May 18, 1990. On this form, Ms. Sanders checked two boxes indicating that Michelle had produced a driver's license and an original Social Security card, establishing employment eligibility. However, Michelle testified that she had not shown Ms. Sanders her Social Security card on May 18th because she did not have it with her. She could not find it at the time. Michelle was only able to produce a driver's license.

Michelle started working at Pizza Hut on the evening of May 14, 1990. According to Michelle's testimony, twice during the week of May 28th, Ms. Sanders told Michelle that she needed to produce a Social Security card and a birth certificate. No deadline was given, however. Michelle indicated that she would look for them. She also called her mother in Trenton, Missouri to ask her to look for the documents at home.

On the morning of June 4, 1990, Michelle had a telephone conversation with her mother and her mother said that she could not find the Social Security card. Michelle testified, "But I found out she couldn't find [the documents], so my only option was that I would have to find them." Michelle had asked both Pizza Hut and Dairy Queen for June 12th off so that she could go back to Trenton where she had to make a court appearance. Michelle apparently intended to look for the documents on that day as well.

Michelle worked at Pizza Hut on the evening of June 4th. At that time, according to Michelle, Ms. Sanders apparently confronted her about the documents that she had requested. Michelle testified that Ms. Sanders said that she needed the documents by Friday, June 8th, or Michelle would be terminated. Michelle testified further that because she was working at both Pizza Hut and Dairy Queen for that week, without the same days off at either one, it was difficult for her to go to Trenton by June 8th unless she went in the middle of the night between jobs.

Michelle discussed the situation with her boyfriend, Craig, and they decided that they should go to Trenton after work on June 4th. Ms. Sanders was at Pizza Hut until the afternoon on June 4th and then left, but came back between 9:00 and 11:00 p.m. and left again "shortly after eleven." Michelle testified that before Ms. Sanders left, Michelle told her that she and Craig were going to go to Trenton that evening after work. However, Michelle did not recall whether or not Ms. Sanders told her not to go on the trip.

Nicole Sanders testified that employees at Pizza Hut are not allowed to take personal trips while they are on the time clock. If an employee takes a break during a shift, she needs to be off the clock. Ms. Sanders testified that she did not tell Michelle to go to Trenton after work on June 4th to get the documents. Rather, she stated that she told Michelle and Craig not to go anyplace that evening of June 4th. Ms. Sanders testified that Michelle and Craig told her they were going to Trenton that night "to show Missy's mom the new car they had just bought." Ms. Sanders stated that she did not specifically remember interviewing Michelle and she did not specifically recall seeing Michelle's Social Security card or driver's license. Further, she stated that she did not remember discussing the Social Security card and/or birth certificate with Michelle and she did not remember giving Michelle a deadline of June 8th to produce the documents. Nonetheless, by adopting the findings of the ALJ, the Commission accepted the June 8th deadline.

Greg Barnette, an assistant manager at Pizza Hut, was working on the evening of June 4th and recalled that he "did mention that [Craig and Michelle] probably shouldn't be driving that distance, you know, that late at night." Mr. Barnette, however, did not remember if he said that to Craig or Michelle directly. He just remembers saying it.

Michelle and Craig left Pizza Hut at approximately twelve-thirty in the morning on June 5th and went to their apartment in Columbia to change clothes. After stopping to get gas, they proceeded to drive to Michelle's mother's home in Trenton. Craig drove and Michelle was in the passenger's seat. In Jacksonville, Missouri, about half-way between Columbia and Trenton, Craig fell asleep at the wheel and the car crashed and burned. As a result of that accident, Michelle suffered serious injuries.

Michelle timely filed a claim for compensation with the Division of Workers' Compensation on April 29, 1991.

A trial took place on April 21, 1993 before the Division of Workers' Compensation. In its findings of fact and rulings of law, dated August 20, 1993, the ALJ stated, in part, as follows:

> In this case the Claimant had numerous options for compliance with the federal law and employer's requirements; unfortunately, the one claimant chose was extremely detrimental to claimant. This fact is relevant in showing the degree of control and "requirement" of the trip by the employer. In this case the employer did not require the trip or dictate the means of compliance with its requirement, and it is believed the assistant manager discouraged the trip. It is also believed that the employer would have, at the time the trip occurred, not authorized or required such trip if the Employer would have believed it was responsible for Claimant's compliance with the verification mandate.... The decision to go to Trenton on the morning of the 5th was decided by Claimant and Mr. McCracken, not the employer.
>
> In this case the Employer did not exercise any control or supervision and did not mandate the travel; Claimant did not choose to call her mother and request that she look more diligently before the June 8th deadline. She did not contact the Social Security office for an alternative Social Security card nor did she follow the advice of her "friends" to wait until Mr. McCracken had more rest.
>
> *     *     *     *     *     *
>
> Being an essential condition of employment in and of itself does not meet the arising out of and in the course of employment and additional nexus to the Claimant's actual services to be performed is required for an activity to be incidental to employmen[t]. This case is absent any act

by the Employer or any relationship to the Employee's duties which satisfies that additional requirement or provided a "special nexus". All compensation is denied Claimant.

On September 7, 1993, Michelle filed an application for review of the ALJ's determination. The Commission entered a final award denying compensation on April 8, 1994, affirming and incorporating the ALJ's award of August 20, 1993. This appeal followed.

In her sole point on appeal, Michelle argues that the Commission erred in denying her compensation in that the facts as found by the Commission showed that her injury arose out of and was within the scope and course of her employment.

The standard of review is set forth in section 287.495.1, RSMo 1986, which provides, in pertinent part, as follows:

Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

The function of this court in reviewing the Commission's decision is to determine whether the Commission's findings are supported by competent and substantial evidence. *Gudde v. Heiman Grain, Inc.*, 830 S.W.2d 574, 576 (Mo.App.1992). We may set aside the Commission's decision only if the findings of the Commission are clearly contrary to the overwhelming weight of the evidence or no competent and substantial evidence supports it. *Id.* ˙

All of the evidence and legitimate inferences therefrom must be viewed in the light most favorable to the award. *Phillips v. Ozark Bank,* 803 S.W.2d 662, 663 (Mo.App. 1991). We may not substitute our judgment for that of the Commission. *Id.* Conflicts in the evidence are for resolution by the Commission, and we must disregard any evidence which might support a finding different from that of the Commission. *Id.* The Commission is charged with the responsibility of passing upon the credibility of all the witnesses and may disbelieve testimony of a witness even if no contradictory or impeaching evidence appears. *Id.*

The fundamental purpose of the Workers' Compensation Law is to place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment. *Brenneisen v. Leach's Standard Service Station,* 806 S.W.2d 443, 445 (Mo.App.1991). The law must be broadly and liberally interpreted and is intended to extend its benefits to the largest possible class. *Id.* All doubts as to the right of an employee to compensation must be resolved in favor of the injured employee. *Id.* However, this does not extend to the authorization of a claim lacking some essential element required by law. *Gudde,* 830 S.W.2d at 576.

To be entitled to benefits under the Missouri Workers' Compensation Law, the employee must show that her injury was the result of an accident *arising out of and in the course of her employment.* *Haynes v. R.B. Rice, Div. of Sara Lee,* 783 S.W.2d 403, 406 (Mo.App.1989); § 287.120, RSMo Supp. 1993. The terms "out of" and "in the course of" are separate tests which must both be met for the injury to be compensable. *Jordan v. Farmers State Bank,* 791 S.W.2d 1, 2 (Mo.App.1990). It is well settled that an accident arises "out of" the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury. *Alexander v. D.L. Sitton Motor Lines,* 851 S.W.2d 525, 527–28 (Mo. banc 1993) (citations omitted). "An accident ... should not be defined merely by its precipitating cause, but instead by the entire se-

quence of events that takes place, by the injuries suffered, and by whatever cause or causes give rise to those events and injuries." *Id.* at 528. The proper test of "causal connection" is whether the conditions of employment caused or contributed to cause the accident. *Id.* at 528.

"In the course of" has been defined to mean "occurring within the period of employment at a place where the employee may reasonably be, while the person is reasonably fulfilling the duties of employment or engaged in doing something incidental thereto." *Jordan,* 791 S.W.2d at 2 (citations omitted).

■ Every case involving the phrase "arising out of and in the course of employment" should be decided upon its own particular facts and circumstances and not by reference to some formula. *Brenneisen,* 806 S.W.2d at 445 (citing *Wamhoff v. Wagner Electric Corp.,* 354 Mo. 711, 190 S.W.2d 915, 917 (banc 1945)). Each case must turn upon the point of whether, under its particular circumstances, the injury arose from something which had become an incident to the employment. *Id.*

Appellant cites to *Brenneisen v. Leach's Standard Service Station,* 806 S.W.2d 443 (Mo.App.1991), in support of her argument that she is entitled to compensation. In *Brenneisen,* decedent worked as a mechanic at employer's service station. *Id.* at 444. Employees at this service station wore a uniform which was supplied by a company that also cleaned and maintained the uniforms. *Id.* at 444. Money was deducted from each employee's wages to pay for the cost of cleaning the uniforms. *Id.* at 444–45. The soiled uniforms were picked up every Friday morning and a clean supply was left for each employee for the following week. *Id.* at 445. If an employee failed to leave his soiled uniforms at the service station for the Friday pickup, that employee would have clean uniforms for the following week, but not the week thereafter. *Id.* at 445.

Decedent in *Brenneisen* drove to work on a Thursday, but forgot to take his soiled uniforms with him. *Id.* at 445. After he clocked out of work that evening, he rode home on a fellow employee's motorcycle, retrieved his uniforms, and while returning to the station, he collided with a parked car and died. *Id.* at 445.

The court in *Brenneisen* reversed the Commission's finding that decedent's fatal injury did not arise out of and in the course of employment. *Id.* at 449. The court found that the testimony of the service station owner revealed that (1) if an employee did not want money taken out of his paycheck for the uniforms and was not considered a good employee, he possibly would be terminated; (2) the wearing of the uniform was mandatory; (3) the wearing of the uniform was a benefit to both the employer and the employee; and (4) "most importantly," the employer allowed other employees to leave work during regular working hours to return home to retrieve their dirty uniforms to be picked up by the cleaning service. *Id.* at 447. The owner himself frequently followed this practice as well. *Id.* at 447. Thus, the court found the "crucial fact" to be that other employees, including the owner, traveled to their homes to recover their uniforms. *Id.* at 447. This, combined with the unquestioned fact that the wearing of the uniform was a benefit to the employer, was "more than sufficient to fall within the 'Mutual Benefit' doctrine," and thus the accident was compensable. *Id.* at 447.

■ Under the mutual benefit doctrine, an injury suffered by an employee while performing an act for the mutual benefit of the employer and the employee is compensable when some advantage to the employer results from the employee's conduct. *Id.* at 448. Under the dual purpose doctrine, which is normally applied only to a situation involving travel, if the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. *Id.* at 448.

The court in *Brenneisen* found that the evidence "clearly shows that the deceased was traveling as a necessity of the employer and as a consequence the risk involved arose out of his employment and his death is compensable." *Id.* at 448. The court concluded that decedent's accident arose out of and in

the course of his employment and his death is compensable. *Id.* at 449.

The case at bar is distinguishable from *Brenneisen* in that, in the case at bar, Michelle was not required or directed to travel to Trenton in the middle of the night to retrieve her Social Security card. There were other options available to her. Her work at Pizza Hut did not create the necessity that she travel so late at night. Assuming Ms. Sanders gave Michelle a deadline of June 8th to produce her Social Security card while Michelle was working on June 4th, Michelle had all week to get the required documentation or to look into other ways to retrieve a Social Security card other than having to travel to Trenton to look for it herself. She was not forced to go that evening to find her card. She, not her employer, made the decision to drive to Trenton. Furthermore, the evidence when viewed in the light most favorable to the Commission's award showed that Ms. Sanders and other Pizza Hut employees tried to discourage Michelle and Craig from traveling so late at night. In *Brenneisen,* by contrast, the employer knew and acquiesced in the employees traveling to their homes to retrieve their uniforms and the employer himself did this as well.

In appellant's brief, she discusses the concept of "employer compulsion" and cites cases to support her argument that she is entitled to compensation because her employer compelled her to travel to Trenton in the middle of the night to find her Social Security card. The cases to which appellant cites are *Graves v. Central Electric Power Coop.,* 306 S.W.2d 500 (Mo.1957), *Hollingsworth v. Biebel Brothers Roofing,* 873 S.W.2d 664 (Mo.App.1994), and *Shannon v. St. Louis Board of Education,* 577 S.W.2d 949 (Mo. App.1979). However, all three cases, which held that the accidents arose out of and in the course of the employee's employment, are distinguishable from the case at bar. In *Graves,* the employer in effect directed the employee to participate in the company's picnic activities while performing the duties of his employment (stand-by duty). *Graves,* 306 S.W.2d at 503. The employee drowned trying to rescue his son who had fallen in the lake while the employee and his family were boating at the picnic. Boating was one of the picnic activities provided by the employer, and the employer's general manager personally knew that the employee and his family were taking a boat ride during the time that the employee was performing stand-by duty. *Id.* at 502.

In *Hollingsworth,* the employee broke his wrist playing volleyball at a company picnic and was awarded compensation. *Hollingsworth,* 873 S.W.2d at 665. The employee, a supervisor, testified that management requested that he encourage the other employees to come to its first-ever company picnic which was apparently being held to smooth out employer-employee relations. *Id.* The employee and another supervisor stated that they believed they had no choice about attending the picnic. *Id.* The court found that, in cases involving injuries incurred while participating in employer-sponsored recreational activities, an especially significant factor is "the extent of the employer's control or direction of the activity." *Id.* The court found that there was sufficient evidence that the employee felt indirectly compelled to attend the company picnic, that the employer received a benefit from holding the picnic, and that the employer "completely controlled" the company picnic. *Id.* at 666.

In *Shannon,* a condition of the employee's employment as a teacher at Harris Teachers College was that he acquire a doctorate degree by a certain date. *Shannon,* 577 S.W.2d at 951. The employee was injured when he slipped and fell on an icy sidewalk on the Washington University campus where he was taking classes for his doctorate degree. *Id.* The court looked at the following factors to determine if the injury was compensable: (1) whether the taking of the college course at Washington University was sufficiently related to the employee's employment; (2) whether the employee was compelled, either directly or indirectly, to take the course; (3) whether the employer derived some benefit from the employee's taking the course; and (4) whether the employer controlled or participated in the activity. *Id.* The presence or absence of any one of such factors may or may not be determinative.

*Id.* at 951–52. The significance of each factor must be considered in the totality of the circumstances presented. *Id.* at 952.

The court in *Shannon* found that the Commission could reasonably have found that the employee was compelled to obtain his doctorate and that there was a benefit to the employer in maintaining quality faculty. *Id.* at 952. The court also found that there was an element of control in that employee's progress at Washington University was supervised. *Id.* at 952. Furthermore, the employer permitted the employee to take time off from his usual hours of work to attend classes, and the fall occurred during regular working hours for which the employee was paid. *Id.* at 952. The court stated, "Since the work of employee created a necessity for travel from Harris to class at Washington University, even though at the same time he was serving some purpose of his own, in going to the cafeteria, he was engaged in a work-related activity at the time of his fall under the 'dual purpose doctrine.'" *Id.* at 952. The court concluded that the employee was about his employer's business at the time of his fall and sustained an accident arising out of and in the course of his employment. *Id.* at 953.

The case at bar is distinguishable from the three cases above-cited because, in the case at bar, the record shows no such employer compulsion. Furthermore, under the dual purpose doctrine, Michelle's work did not create a necessity for travel. Michelle testified that Ms. Sanders told her on Monday, June 4th that she needed to produce her Social Security card by Friday, June 8th. Even if Michelle was working that whole week, there were other alternatives to getting her Social Security card besides driving three hours in the middle of the night. Ms. Sanders did not direct Michelle to drive to Trenton that night and, in fact, she and other employees apparently tried to discourage Michelle and Craig from going on the trip. Michelle and Craig made the decision to drive to Trenton after work and no one else compelled them to do so.

Appellant also argues that her injury was compensable under the "special hazard" rule and cites to *Snowbarger v. Tri–County Electric Cooperative,* 793 S.W.2d 348 (Mo. banc 1990), in support of her argument. In *Snowbarger,* the employee worked 86 of a 100.5 hour period during an emergency created by an ice storm. *Id.* at 349. The overtime work was required by his employer. At 1:00 a.m., the employee went off duty and while returning home, fell asleep at the wheel of his car and died. *Id.* at 349. The Commission found that the employee's case was compensable under Missouri Workers' Compensation Law because his accident arose out of and in the course of his employment in that he fell asleep at the wheel of his car as the result of the long hours he had worked immediately before the accident. *Id.* at 349. The Commission, while noting the general rule that injuries occurring while driving to and from work are not compensable, concluded that the employee was subjected to a "special hazard" in driving home from work at that hour after working exhaustingly long overtime hours at the bidding of his employer. *Id.* at 349.

The court in *Snowbarger* stated that a "special situation or condition may ... exist where there is a peculiar or abnormal exposure to a peril, whose risk is incident to or inseparable from the scene of employment." *Id.* at 350. The court found that the employer "more than acquiesced in causing the condition of complete fatigue owing to the draining and grueling overtime hours spent in manual labor in extreme cold." *Id.* at 350. The court concluded that the employee encountered an abnormal exposure to an employment related peril because of the unusually long overtime hours he had worked, and that the condition was incident to his employment because the work was "at the bidding and for the benefit of his employer." *Id.* at 350.

The "special hazard" rule set forth in *Snowbarger* is not applicable to the case at bar. Michelle had not worked overtime on the evening of June 4th and Ms. Sanders did not direct Michelle to drive to Trenton that evening to obtain her Social Security card. Any peculiar or abnormal exposure to a peril (*i.e.,* by driving to Trenton in the middle of the night after work) was created by Michelle and Craig's own decision to do so, and

the risk was not incident to and inseparable from the scene of employment.

Finally, appellant argues that compensation should be awarded under the "special errand" theory and cites cases from jurisdictions outside of Missouri to support her argument. The "special errand" rule states that when an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself. 1 Larson, *Workmen's Compensation Law,* § 16.10 (1993). The element of urgency may supply the necessary factor converting a trip into a special errand. 1 Larson, *Workmen's Compensation Law,* § 16.15 (1993).

Thus, while the general rule is that accidents incurred while an employee is going to or coming from work are not compensable because they do not arise out of and in the course of employment,[1] that rule is not applicable where the employee during that period performs a special task, service or errand in connection with her employment. *Delozier v. Munlake Constr. Co.,* 657 S.W.2d 53, 55–56 (Mo.App.1983) (citations omitted). "Such circumstances might be better characterized as causing a trip made in performing such a special task to be a part of the employment." *Id.* at 56.

We find that the "special errand" rule does not apply to the instant case. According to the rule and cases that discuss the rule, the employer must direct the employee to do a specific task at a particular time and the accident or injury must occur while the employee is on that "special errand" for the employer. In the case at bar, Ms. Sanders, as stated above, did not direct Michelle to drive to Trenton after work on the evening of

June 4th to find her Social Security card. Rather, Ms. Sanders merely told Michelle on a Monday that she had to produce the card by the following Friday. Michelle was not on a "special errand" for Pizza Hut when she drove to Trenton in the middle of the night to find her Social Security card. Michelle and Craig made a personal choice to drive that evening when there were other options available.

An important step in cases of employment-related injuries is to scrutinize the factual setting to determine whether there is a direct and positive causal connection between the employment and the injury. *Snowbarger,* 793 S.W.2d at 349–50 (citing *Van Devander v. Heller Electric Co.,* 405 F.2d 1108, 1110 (D.C.Cir.1968)). There must be continuity of cause combined with continuity in time and space. *Id.* at 350.

We find that the evidence does not support a finding that Michelle's injury arose out of and in the course of her employment. Ms. Sanders gave Michelle a reasonable time frame in which to obtain her Social Security card and there were other alternatives available to Michelle besides driving in the middle of the night after work to look for the card at her mother's home. She could have asked her mother to look for the card again, she could have looked into getting another copy of her Social Security card, or she could have switched her schedule with another employee at Dairy Queen so that she could have a day off before June 8th to drive to Trenton. The record does not reflect that Ms. Sanders in any way directed Michelle to drive to Trenton after work on June 4th to get her Social Security card.

The Commission's finding is supported by competent and substantial evidence and is affirmed.

All concur.

---

1. We note that Michelle was not "going to" or "coming from" work when the accident occurred. Rather, Michelle and Craig stopped at their apartment first after work, then filled their car up with gasoline, and then proceeded to drive to Michelle's mother's house in Trenton. Thus, the "going to or coming from" rule is not applicable to the factual scenario here.